**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 29 2002**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

SOUTHERN UTAH WILDERNESS
ALLIANCE, a Utah non-profit
corporation; THE WILDERNESS
SOCIETY, a national non-profit
corporation; SIERRA CLUB, a
California non-profit corporation;
GREAT OLD BROADS FOR
WILDERNESS, a Utah non-profit
corporation; WILDLANDS CPR, a
Montana non-profit corporation;
UTAH COUNCIL OF TROUT
UNLIMITED, a Utah non-profit
organization; AMERICAN LANDS
ALLIANCE, a national non-profit
corporation; and FRIENDS OF THE
ABAJOS, a Utah non-profit
corporation,

       Plaintiffs - Appellants,

v.

GALE NORTON, Secretary, United
States Department of the Interior;
NINA ROSE HATFIELD, Acting
Director, Bureau of Land
Management; and BUREAU OF
LAND MANAGEMENT,

       Defendants - Appellees,

No. 01-4009

STATE OF UTAH; SAN JUAN
COUNTY; EMERY COUNTY; THE
SCHOOL AND INSTITUTIONAL
TRUST LANDS ADMINISTRATION;
KANE COUNTY; WAYNE COUNTY,
UTAH; UTAH SHARED ACCESS
ALLIANCE, a Utah non-profit
corporation; BLUE RIBBON
COALITION, an Idaho non-profit
corporation; ELITE MOTORCYCLE
TOURS, a Utah corporation; and
ANTHONY CHATTERLEY,

      Defendants - Intervenors -
Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:99-CV-852-K)**

---

James S. Angell, Earthjustice Legal Defense Fund, Denver, Colorado (Heidi
McIntosh and Stephen H. M. Bloch, Southern Utah Wilderness Alliance, Salt
Lake City, Utah, with him on the briefs), for Plaintiffs-Appellants.

Susan Pacholski, Attorney, Environment and Natural Resources Division, U.S.
Department of Justice, Washington, D.C. (Eileen Sobeck, Deputy Assistant
Attorney General, Washington, D.C.; Paul W. Warner, United States Attorney,
District of Utah, Salt Lake City, Utah; Stephen Roth and Jeffrey Nelson, Assistant
United States Attorneys, District of Utah, Salt Lake City, Utah; and John A.
Bryson, Attorney, Environment and Natural Resources Division, U.S. Department
of Justice, Washington, D.C., with her on the brief), for Defendants-Appellees.

Paul A. Turcke, Moore, Smith, Buxton, & Turcke, Chartered, Boise, Idaho, for
Intervenors-Appellees.

Ralph L. Finlayson, Assistant Attorney General, Stephen G. Boyden, Assistant

Attorney General, Mark L. Shurtleff, Attorney General, and Stephen H. Urquhart, Office of the Attorney General, Salt Lake City, Utah; John W. Andrews, Utah School and Institutional Trust Lands Administration, Salt Lake City, Utah; filed a brief for State, Counties and Trust Land Administration Intervenors-Appellees.

---

Before **EBEL**, **McKAY**, and **LUCERO**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

The Southern Utah Wilderness Alliance and a number of other organizations (collectively, SUWA) brought suit in the United States District Court for the District of Utah against the Bureau of Land Management (BLM), alleging, among other claims, that the BLM violated the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq., and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., by not properly managing off-road vehicle and/or off-highway vehicle (collectively, ORV) use on federal lands that had been classified by the BLM as Wilderness Study Areas (WSAs) or as having "wilderness qualities." SUWA sought relief under the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq., claiming that the BLM should be compelled under § 706(1) of the APA to carry out mandatory, nondiscretionary duties required by the FLPMA and NEPA. See 5 U.S.C. § 706(1). The district court rejected SUWA's arguments and dismissed the relevant claims for want of subject matter jurisdiction. In reaching this

-3-

conclusion, the district court reasoned that as long as an agency is taking some action toward fulfilling mandatory, nondiscretionary duties, agency action may not be compelled pursuant to § 706(1). The district court also suggested that the BLM could not be compelled to comply with provisions in a land use plan (LUP) promulgated pursuant to the FLPMA unless or until the BLM undertook or authorized an "affirmative project[]" that conflicted with a specific LUP requirement. Finally, the court concluded that the BLM did not abuse its discretion in determining that a supplemental Environmental Impact Statement (SEIS) was not necessary based on new information about increased ORV use.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **REVERSE** and **REMAND**. Our remand, however, is a narrow one, concluding only that the district court erred in dismissing this case for lack of subject matter jurisdiction and in concluding, at the motion to dismiss stage, that SUWA failed to state a claim that the BLM had a duty to consider a SEIS based on new circumstances. The merits of the claim will need to be addressed on remand.

I. Procedural Background

On October 27, 1999, SUWA filed suit in the district court alleging that the BLM had "failed to perform its statutory and regulatory duties" by not preventing harmful environmental effects associated with ORV use. On November 24, 1999,

-4-

a group of ORV users (the Recreationists) filed a motion to intervene in the suit, which the district court subsequently granted. Two months after the district court allowed the Recreationists to intervene, SUWA filed a second amended complaint that asserted ten causes of action against the BLM and that sought to have the court compel agency action under § 706(1) of the APA. Three of these claims–that the BLM failed to comply with the FLPMA, refused to implement provisions of various land management plans, and did not take a "hard look" under NEPA at increased ORV use–are relevant to this appeal and will be discussed individually below.

SUWA then moved for a preliminary injunction "to protect nine specific areas from further ORV damage." The Recreationists responded to this motion by arguing that the claims were not actionable under § 706(1) and should be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. On December 22, 2000, the district court denied SUWA's preliminary injunction request and granted the BLM's motion to dismiss. The court then certified the dismissed claims as final judgments under Rule 54(b) of the Federal Rules of Civil Procedure, and this appeal followed.[1]

---

[1]SUWA filed its notice of appeal before the district court certified the dismissed claims for appeal under Rule 54(b). On February 5, 2001, this court issued a show cause order informing the parties that unless the district court either certified the dismissed claims under Rule 54(b) within thirty days or

(continued...)

## II. Standard of Review

A district court's dismissal of claims under Rule 12(b)(1) is reviewed de novo. United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 547 (10th Cir. 2001); SK Fin. v. La Plata County, 126 F.3d 1272, 1275 (10th Cir. 1997). Any factual determinations made by the district court in making its jurisdictional ruling are reviewed for clear error. United Tribe, 253 F.3d at 547.

## III. FLPMA Claim under § 706(1) of the APA

SUWA's first argument on appeal is that the district court's conclusion that § 706(1) of the APA did not give it subject matter jurisdiction over its FLPMA-based claims was erroneous. The core of SUWA's argument is that the FLPMA imposes a mandatory, nondiscretionary duty on the BLM to manage WSAs in such a way that their wilderness values are not impaired. Ongoing ORV use, they allege, is impairing these values, and, therefore, they claim that the BLM must be

---

[1](...continued)
explicitly adjudicated the remaining claims within thirty days, the appeal would be dismissed. On February 9, 2001, the district court issued Rule 54(b) certification, and, upon receipt of the district court order, the question of appellate jurisdiction was referred to the panel hearing the merits of this case. Given that the parties obtained Rule 54(b) certification within thirty days of our show cause order, the premature notice of appeal is "deemed to [have] ripen[ed] as of the date of certification," and we have "jurisdiction over the appeal." United States v. Hardage, 982 F.2d 1491, 1494 (10th Cir. 1993); cert. denied, 516 U.S. 1009 (1995); see Kelley v. Michaels, 59 F.3d 1055, 1057 (10th Cir. 1995); Lewis v. B.F. Goodrich Co., 850 F.2d 641, 645-46 (10th Cir. 1988) (en banc).

compelled to prevent impairment caused by ORV use. For the reasons discussed below, we conclude that the BLM has a mandatory, nondiscretionary duty to manage the WSAs in accordance with the FLPMA's nonimpairment requirement. We further conclude that, on the record before us, SUWA has presented a colorable claim that the BLM's present management of the disputed WSAs may be violating the FLPMA's mandate. Consequently, we reverse the district court's dismissal of SUWA's "nonimpairment claim" for want of subject matter jurisdiction under § 706(1).

## A. FLPMA

In 1976, Congress enacted the FLPMA, a "complex" and "comprehensive" statute that created a "versatile framework" for governing the BLM's management of public lands. Rocky Mountain Oil & Gas Ass'n v. Watt, 696 F.2d 734, 737-38 (10th Cir. 1982). The Act required that the Secretary of the Interior "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values." 43 U.S.C. § 1711(a); see Utah v. Babbitt, 137 F.3d 1193, 1198 (10th Cir. 1998); Rocky Mountain Oil & Gas, 696 F.2d at 740. During this inventory process, the Secretary was to identify "roadless areas of five thousand acres or more and roadless islands of the public lands" that possessed "wilderness

characteristics."[2]  42 U.S.C. § 1782(a).  The process of identifying lands as

having wilderness characteristics involved two steps.  First, the BLM conducted

an "initial inventory," during which it "identif[ied] wilderness inventory units,

which were defined as roadless areas of 5000 acres or more that may have

wilderness characteristics."  Utah, 137 F.3d at 1198 (internal quotation marks

omitted; emphasis added).  After completing this initial inventory, the BLM then

conducted an "intensive inventory of these units to determine whether the units

possessed wilderness characteristics."  Id. (internal quotation marks omitted).

Areas found by the BLM to possess wilderness characteristics were then

designated by the BLM as Wilderness Study Areas, or WSAs.[3]  Id.; Sierra Club v.

---

[2]The FLPMA incorporates the Wilderness Act of September 3, 1964's definition of "wilderness."  See 43 U.S.C. § 1782(a).  That act, in relevant part, defines "wilderness" as

> an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, . . . which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c).

[3]In 1980, the BLM designated 2.5 million acres of federal land in Utah as WSAs.  See 45 Fed. Reg.  75,602, 75,603 (Nov. 14, 1980).  Four areas designated as WSAs are at issue in this case: Moquith Mountain, Parunuweap Canyon, Sid's Mountain, and Behind the Rocks.

Hodel, 848 F.2d 1068, 1085 (10th Cir. 1988), overruled on other grounds by Vill. of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970 (10th Cir. 1992) (en banc). The Act mandated that, within fifteen years of the FLPMA's enactment, the Secretary review the WSAs and recommend to the President which WSAs would be suitable for "preservation as wilderness." 43 U.S.C. § 1782(a). The FLPMA required that, two years after receiving the Secretary's report, the President submit to Congress "his recommendations with respect to designation as wilderness of each such area." § 1782(b).

The FLPMA, however, provides that only Congress may actually designate land for wilderness preservation. Id. Consequently, until Congress either affirmatively designates or expressly rejects a particular WSA for wilderness preservation, the FLPMA mandates that the BLM "shall continue to manage" the WSAs "in a manner so as not to impair the suitability of such areas for preservation as wilderness." § 1782(c) (emphasis added); see also Hodel, 848 F.2d at 1085 (explaining the BLM's obligation to preserve WSAs); Sierra Club v. Clark, 774 F.2d 1406, 1408 (9th Cir. 1985) (discussing how areas designated for preservation must not be impaired). Thus, once land is designated as an WSA, the FLPMA imposes an immediate and continuous obligation on the BLM to manage such parcels in such a way that they will remain eligible for wilderness classification should Congress decide to designate the areas for permanent

-9-

wilderness preservation.[4]  Hodel, 848 F.2d at 1085; Interim Management Policy

for Lands Under Wilderness Review (IMP) at 5 (Aplt. App. at 192).

---

[4]The FLPMA does not explain what the terms "preservation," "wilderness," or "impair" mean.  The BLM, however, has interpreted this "nonimpairment" mandate in a document entitled the Interim Management Policy for Lands Under Wilderness Review (IMP), which was issued as a federal regulation at 44 Fed.Reg. 72,014.  See Hodel, 848 F.2d at 1086; see also Rocky Mountain Oil & Gas, 696 F.2d at 739 n.6 (explaining that the IMP was "promulgated using notice and comment procedures).  Courts give deference to the BLM's interpretation of the FLMPA, as expressed in the IMP, particularly where language in the FLMPA is ambiguous.  See Hodel, 848 F.2d at 1087 (deferring to the IMP's reconciliation of tensions within the FLPMA); Clark, 774 F.2d at 1409-10 (deferring to the BLM's interpretation of the FLMPA as announced in the IMP); Rocky Mountain Oil & Gas, 696 F.2d at 745 ("Where the [FLMPA] is ambiguous, we must afford deference to the interpretation given the statute by the agency charged with its administration.").

According to the IMP, "Management to the nonimpairment standard does not mean that the lands will be managed as though they had already been designated as wilderness."  Rather the nonimpairment standard requires the BLM "to ensure that each WSA satisfies [the definition of wilderness] at the time Congress makes a decision on the area."  "The Department therefore has a responsibility to ensure that the existing wilderness values of all WSAs . . . are not degraded so far, compared with the areas's values for other purposes, as to significantly constrain the Congress' prerogative to either designate a WSA as a wilderness or release it for other uses" (emphasis in original).

As part of the nonimpairment mandate, the IMP mandates that the BLM may only authorize "non-impairing" activity in the WSAs.  Under the IMP, use of WSA land will be considered "non-impairing" if two criteria are met.  First, the use must be temporary in nature, meaning that it does not "create surface disturbance or involve permanent placement of structures" (emphasis added).  The IMP defines "surface disturbance" as "any new disruption of the soil or vegetation which would necessitate reclamation."  Second, after the activity terminates, "the wilderness values must not have been degraded so far as to significantly constrain the Congress's prerogative regarding the area's suitability for preservation as wilderness."

-10-

B. 706(1) of the APA

Section 706(1) of the APA provides that federal courts "shall" "compel

agency action unlawfully withheld or unreasonably delayed."[5] 5 U.S.C. § 706(1);

see also Forest Guardians v. Babbitt, 174 F.3d 1178, 1187 (10th Cir. 1999)

("Through § 706 Congress has stated unequivocally that courts must compel

_____

[5]Although the district court indicated that its disposition of this case would have been the same regardless of whether the SUWA suit was characterized as one seeking to compel "unreasonably delayed" action or "unlawfully withheld" action, it concluded that SUWA's claim amounted to one alleging an unreasonable delay. The district court, invoking our decision in Forest Guardians v. Babbitt, 174 F.3d 1178 (10th Cir. 1999), reasoned that this action fell under the "unreasonably delayed" category because "there are no 'date-certain deadlines' by which [the] BLM's ORV management must operate." Unlike the district court, we believe that SUWA's nonimpairment claims fall in the "unlawfully withheld" category.
We explained in Forest Guardians that "if an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions . . . , a court must compel only action that is delayed unreasonably. Conversely, when an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action and courts, upon proper application, must compel the agency to act." 174 F.3d at 1190.
As discussed above, the FLPMA imposes an immediate and continuous obligation on the BLM to manage a parcel designated as a WSA in such a way that its wilderness values are not impaired and the land always remains eligible for designation as permanent wilderness areas at any moment Congress might decide to give them that status. See 43 U.S.C. § 1782(c). We conclude that Congress did impose an absolute deadline by which the BLM has to prevent impairment because this duty begins the moment the land is designated as a WSA and continues until Congress makes a decision regarding permanent wilderness designation. While Congress did not state this deadline in a date specific manner, it nonetheless created a deadline: the time when Congress makes the decision on wilderness designation.

-11-

agency action unlawfully withheld or unreasonably delayed" (emphasis added).);

Marathon Oil Co. v . Lujan, 937 F.2d 498, 500 (10th Cir. 1991) ("Administrative

agencies do not possess the discretion to avoid discharging the duties that

Congress intended them to perform.").

Under either the "unreasonably delayed" or "unlawfully withheld" prongs

of § 706(1), federal courts may order agencies to act only where the agency fails

to carry out a mandatory, nondiscretionary duty.[6] Forest Guardians, 174 F.3d at

---

[6]Courts have often explained that the standards for compelling agency action through a writ of mandamus and through § 706(1) are very similar, even though the availability of relief under the APA precludes mandamus relief. See, e.g., Mt. Emmons Mining Co. v. Babbitt, 117 F.3d 1167, 1170 (10th Cir. 1997) ("The availability of a remedy under the APA technically precludes [a] request for a writ of mandamus, although the mandatory injunction is essentially in the nature of mandamus relief" (citations omitted).); Yu v. Brown, 36 F. Supp. 2d 922, 928-29 (D.N.M. 1999) ("Seeking to harmonize the Mandamus Statute with the APA, the Tenth Circuit has held that, since mandamus requires that no other remedy be available and the APA provides a means of challenging . . . agency action, technically mandamus relief is no longer available in such cases. However, the court has also recognized [the similarity between mandamus relief and relief under the APA]" (citation omitted).); see also Independence Mining Co. v. Babbitt, 105 F.3d 502, 506-07 (9th Cir. 1997) (analyzing a mandamus claim under § 706(1) because of similarities in the relief). There is, however, an important distinction between compelling agency action through a writ of mandamus and through § 706(1). Even if a party shows that the "prerequisites [for a writ of mandamus] have been met, a court still exercises its own discretion in deciding whether or not to issue the writ." Marquez-Ramos v. Reno, 69 F.3d 477, 479 (10th Cir. 1995) (emphasis added); see also Marathon Oil, 937 F.3d at 500 ("[T]he issuance of the writ is a matter of the issuing court's discretion."). By contrast, once a court determines that an agency "unlawfully withheld" action, the APA requires that courts compel agency action. Forest Guardians, 174 F.3d at 1187-88 (explaining that the use of the word "shall" in § 706 means courts "must

(continued...)

-12-

1187-88. By contrast, if a duty is not mandated, or if an agency possesses discretion over whether to act in the first instance, a court may not grant relief under § 706(1). Id. at 1187-89.

Importantly, compelling agency action is distinct from ordering a particular outcome. Courts have regularly held that an agency may be required to take action and make a decision even if the agency retains ultimate discretion over the outcome of that decision. In Mt. Emmons Mining Co. v. Babbitt, 117 F.3d 1167 (10th Cir. 1997), for example, this court rejected the Secretary of the Interior's claim that he could not be compelled to process a mining patent application because it was not clear that the parties were "unquestionably entitled to a patent." Id. at 1172. Instead, we held that the Secretary could be ordered to comply with statutorily-mandated processing requirements even if the Secretary ultimately had discretion over whether to approve the application. Id.; see also Marathon Oil, 937 F.2d at 500 (upholding district court order to process applications but reversing order instructing approval of applications as exceeding court's authority); Estate of Smith v. Heckler, 747 F.2d 583, 591 (10th Cir. 1984) (ordering the Secretary of Health and Human Services to promulgate regulations).

_____

[6](...continued)
compel agency action unlawfully withheld").

-13-

## C. Analysis of FLPMA Claim

SUWA acknowledges that the BLM possesses considerable discretion over how it might address activity causing impairment. Nonetheless, SUWA argues that the BLM can be ordered to comply with the FLPMA's nonimpairment mandate, even if the BLM retains discretion over the means of prevention.

The BLM and the Recreationists respond by offering several reasons as to why ORV use in the relevant lands is not subject to § 706(1) review and cannot be considered impairment. First, they argue that the IMP's nonimpairment mandate "affords BLM discretion in not only how it will act, but also whether it will act," thus removing the agency's inactions from review under § 706(1). Second, the Appellees, particularly the BLM, contend that § 706(1) may only be invoked where "final, legally binding actions . . . have been unlawfully withheld or unreasonably delayed." Third, assuming the BLM has a mandatory duty to prevent ORV-caused impairment, they argue that SUWA's claim is, in reality, a challenge to the sufficiency of the BLM's efforts to prevent impairing activity caused by ORV use rather than a claim that the BLM has failed to act. Undertaking our de novo review, we first address the arguments raised by the BLM and the Recreationists.

### 1. Discretion under Nonimpairment Mandate

As touched on above, the BLM first argues that the district court's

dismissal of SUWA's impairment for lack of subject matter jurisdiction claims was proper because the BLM has "considerable discretion . . . to determine both what constitutes impairment and what action to take if it finds that impairment is occurring or is threatened."

The BLM's argument, however, misses the narrow jurisdictional issue presented on appeal, i.e., whether the BLM has a nondiscretionary, mandatory duty that it may be compelled to carry out under § 706(1). Neither side seriously disputes that the BLM has such a duty under the FLPMA, which mandates that the BLM manage WSAs in such a way as not to impair their wilderness values. See 43 U.S.C. § 1782(c). In this case, the district court conceded that SUWA offered colorable evidence suggesting that ongoing ORV activity in the WSAs has seriously impaired the wilderness values of the WSAs at issue, acknowledging in its decision that SUWA had "presented significant evidence about the alleged impairment that is occurring in the WSAs due to ORV use."

Certainly, the BLM is correct in arguing, as it does on appeal and as it did before the district court, that we must give considerable deference to its interpretation of the nonimpairment mandate, see Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); Lamb v. Thompson, 265 F.3d 1038, 1047 (10th Cir. 2001); Kurzet v. Comm'r, 222 F.3d 830, 844 (10th Cir. 2000), particularly as laid out in the Interim Management Policy for Lands Under

Wilderness Review (IMP), a BLM-promulgated regulation that significantly interprets the FLPMA's nonimpairment mandate. See Hodel, 848 F.2d at 1087; Rocky Mountain Oil & Gas, 696 F.2d at 745. As we have previously explained, as long as "an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Mission Group Kan., Inc. v. Riley, 146 F.3d 775, 780 (10th Cir. 1998) (internal quotation marks omitted). Similarly, the BLM is correct that, to the extent the IMP and the FLPMA give it substantial discretion in deciding how it will implement the FLPMA's nonimpairment mandate and address potentially impairing activities, a court's ability to compel it to take specific steps to prevent impairment is curtailed, see, e.g., Mt. Emmons, 117 F.3d at 1172; Marathon Oil, 937 F.2d at 500, a point SUWA concedes.

The BLM's arguments, however, go to the merits of the present suit, and to the possible remedy if impairment is found, not to whether federal courts possess subject matter jurisdiction under the APA to order the BLM to comply with the FLPMA's nonimpairment mandate. The BLM seems to confuse the principle that, when deciding whether an area is being impaired, courts must give deference to the BLM's interpretation of the FLMPA's nonimpairment mandate, with the statutory standard making the nonimpairment obligation mandatory. Similarly,

-16-

the BLM appears at times to assume erroneously that because it possesses discretion over the <u>implementation</u> of the nonimpairment mandate, the nonimpairment obligation is itself wholly discretionary. We do not address on this appeal whether ORV use in the region is impairing the WSA's wilderness values. Upon remand, the district court will have to address that issue after analyzing the evidence before it and giving appropriate deference to the IMP. Such deference and discretion do not, however, immunize the BLM from its clear, nondiscretionary duty "to manage such lands . . . so as not to impair the suitability of such areas for preservation as wilderness," 43 U.S.C. § 1782(c), as compelled by § 706(1).[7] Should, therefore, the district conclude that the alleged ORV use represents a failure by the BLM to manage the disputed WSAs in accordance with the FLPMA's nonimpairment mandate, it must compel the agency to comply with its legal duty. <u>Forest Guardians</u>, 174 F.3d at 1187.

---

[7]The IMP gives specific attention to ORV use when discussing impairing activity. For example, the IMP specifically notes that "[c]ross-country vehicle use off boundary roads and existing ways" constitutes surface disturbance–specifically defined as "impairing" activity under the IMP–because "the tracks created by the vehicles leave depressions or ruts, compact the soils, and trample or compress vegetation." The regulation also holds that vehicles may not drive off "existing trails" except (1) in emergency situations, (2) by state or federal officials to protect human life, safety, and property, (3) where the area was designated for ORV use prior to FLPMA, or (4) where the vehicle will be traversing on sand dunes or snow areas that have been designated for that type of recreational activity. Similarly, the IMP indicates that recreational activities normally permitted within WSAs may be restricted if they "depend upon cross-country uses of motor vehicles."

## 2. Final Action Argument

On appeal, the BLM also asserts that § 706(1) only applies to "final, legally binding actions that have been unlawfully withheld or unreasonably delayed." Apparently, the BLM believes that a court may only compel agency action under § 706(1) if the unlawfully withheld action would itself be considered a "final" action under § 704 of the APA, which limits judicial review to final agency actions.[8] 5 U.S.C. § 704. According to the BLM, § 706(1) is not available for "day-to-day management actions," which, in its view, includes dealing with the ORV use at issue in this case. In essence, the BLM seems to argue that, because it could prevent impairment by ORV use through steps that might not themselves be considered a final agency action, federal courts lack subject matter jurisdiction under § 706(1) over these "day-to-day" decisions.

We find the BLM's finality argument unpersuasive, for it seems to read finality in an inappropriately cramped manner. Contrary to the implications of the BLM's argument, the APA treats an agency's inaction as "action." 5 U.S.C.

---

[8]Section 704 defines the limits of federal courts' power to review actions by administrative agencies, declaring, "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Agency action, in turn, is defined as including "the whole or a part of agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Id. § 551(13); see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990) (explaining definition of agency action).

§ 551(13) (defining "agency action" as including a "failure to act"). Where, as here, an agency has an obligation to carry out a mandatory, nondiscretionary duty and either fails to meet an established statutory deadline for carrying out that duty or unreasonably delays in carrying out the action, the failure to carry out that duty is itself "final agency action." Once the agency's delay in carrying out the action becomes unreasonable, or once the established statutory deadline for carrying out that duty lapses, the agency's inaction under these circumstances is, in essence, the same as if the agency had issued a final order or rule declaring that it would not complete its legally required duty. See Coalition for Sustainable Res., Inc. v. United States Forest Serv., 259 F.3d 1244, 1251 (10th Cir. 2001) (explaining circumstances in which agency inaction may be considered "final"); Sierra Club v. Thomas, 828 F.2d 783, 793 (D.C. Cir. 1987) ("[I]f an agency is under an unequivocal statutory duty to act, failure to so act constitutes, in effect, an affirmative act that triggers 'final agency action' review."). Cf. Daniel P. Selmi, Jurisdiction To Review Agency Inaction Under Federal Environmental Law, 72 Ind. L.J. 65, 99-101 (1996) (discussing constructive final agency action); Peter H.A. Lehner, Note, Judicial Review of Administrative Inaction, 83 Colum. L. Rev. 627, 652-55 (1983) (explaining that finality may be found when an agency fails to act by a statutorily imposed deadline or unreasonably delays acting). Consequently, contrary to the BLM's argument, the Bureau's alleged failure to

comply with the FLPMA's nonimpairment mandate can be considered a final action under § 704 that is subject to compulsion under § 706(1).[9] Therefore, the failure of an agency to carry out its mandatory, nondiscretionary duty either by an established deadline or within a reasonable time period may be considered final agency action, even if the agency might have hypothetically carried out its duty through some "non-final" action.[10]

---

[9]Courts have implicitly recognized that unlawfully withheld actions are considered final under § 704. Some emphasize, for example, that an agency must carry out nondiscretionary duties required by law, without discussing whether the withheld duty would be considered a final agency action. Firebaugh Canal Co. v. United States, 203 F.3d 568, 577 (9th Cir. 2000); Forest Guardians, 174 F.3d at 1187-88 (collecting Tenth Circuit cases explaining that an agency must carry out nondiscretionary duties). Courts have sometimes described § 706(1) as an exception to the APA "finality" requirement. See, e.g., Independence Mining Co., 105 F.3d at 511 (citing Public Citizen v. Bowen, 833 F.2d 364, 367 (D.C. Cir. 1987), and Public Citizen Health Research Group v. Comm'r, FDA, 740 F.2d 21, 30-32 (D.C. Cir. 1984)). This description may be slightly inaccurate, however, for § 704 of the APA defines the type of agency actions subject to judicial review and, in relevant part, limits judicial review to final agency actions. 5 U.S.C. § 704. Section 706(1), by contrast, defines the "scope" of judicial review over reviewable agency actions. Id. § 706; see also Aladjem v. Cuomo, No. CIV-A-96-6576, 1997 WL 700511, at *3 n.2 (E.D. Pa. Oct. 30, 1997).

[10]The BLM's argument has other weaknesses. First, it seems somewhat in tension with established precedent holding that an agency may be compelled to make a decision or implement a duty, even if the agency retains discretion over how it will carry out that duty. See, e.g., Mt. Emmons, 117 F.3d at 1172; Marathon Oil, 937 F.2d at 500; Yu, 36 F. Supp. 2d at 931. Second, the BLM's position would seem to create a "no-man's-land" of judicial review, in which a federal agency could flaunt mandatory, nondiscretionary duties simply because it might be able to satisfy these duties through some form of non-final action. Third, in this case, it is clear that many of the steps the BLM might take to address impairment caused by ORV use would be considered final agency actions.

(continued...)

-20-

Accordingly, we reject the BLM's "final, legally binding" argument.

### 3. Partial Compliance

Even if it has a mandatory duty to prevent ORV-induced impairment, the BLM argues that it cannot be compelled to act under § 706(1) because it has taken some partial action to address impairing ORV activity. By and large, the district court rested its jurisdictional ruling on this rationale, reasoning that the BLM could not be compelled to comply with the nonimpairment mandate because the BLM "presented significant evidence about the steps it is and has been taking to prevent [ORV-caused] impairment." We disagree.

It is undisputed that, at least since the instigation of litigation, the BLM has taken some action, including closing certain roads and posting signs indicating that ORV use is prohibited in certain areas, to address alleged impairment of the WSAs caused by ORV use.[11] However, the mere fact that the BLM has taken

---

[10](...continued)
Indeed, as all parties acknowledge, some of the Recreationists who intervened in this suit have brought a separate lawsuit challenging the BLM's decision to close certain ORV routes in the disputed WSAs. Closing roads, fining unauthorized ORV users, licensing some users but not others, issuing new rules restricting ORV use, etc., possibly could all fall within the definition of a final agency action. See 5 U.S.C. § 551(13).

[11]For example, on March 21, 2000, the BLM issued regulations closing 19 ORV routes in the Sids Mountain WSA and limiting ORV use to only "four designated routes." The record further indicates that the BLM erected signs and barricades closing ORV routes and sought assistance from local ORV and environmental groups to effectuate restrictions on ORV use.

(continued...)

some action to address impairment is not sufficient, standing alone, to remove this case from § 706(1) review, as the BLM would have us hold. Indeed, if we were to accept the BLM's argument, we would, in essence, be holding that as long as an agency makes some effort to meet its legal obligations, even if that effort falls short of satisfying the legal requirement, it cannot be compelled to fulfill its mandatory, legal duty. Certainly, the BLM should be credited for the actions it has taken to comply with the nonimpairment mandate; it does not follow, however, that just because the BLM attempts to comply with the nonimpairment mandate, it thereby deprives a court of subject matter jurisdiction to determine

[11](...continued)

In the Moquith Mountain WSA, the BLM began combating increased ORV use in 1993 by posting signs, sponsoring educational programs, and increasing limited law enforcement patrols. In 1998, the BLM followed up on these efforts by closing a number of ORV routes. The BLM also indicated that it was planning additional measures where compliance with these measure has not been as successful as hoped.

As to the third WSA area, the Parunuweap WSA, the BLM published a management order in August 2000 limiting ORV use to designated travel routes and prohibiting cross-country ORV travel outside these areas. During testimony before the district court in 2000, the BLM also indicated that it had planned educational programs on ORV use, had ordered signs that would be posted on closed ORV routes in the area, and would be mailing ORV information to interested parties within several weeks, though it is not entirely clear whether the BLM ever implemented these plans.

Finally, between 1990 and 2000, the BLM prohibited ORV travel in the Behind the Rocks WSA, placed information on bulletin boards explaining ORV restrictions, and posted signs and/or dragged objects in front of unauthorized ORV routes. According to testimony in the record, the BLM also monitored ORV activity in the region.

whether it has actually fulfilled the statutorily mandated duty and potentially compel action if that duty has not been fulfilled.[12]

In support of its argument, the BLM invokes a few decisions from the Ninth Circuit, suggesting that as long as an agency is taking some action toward fulfilling its legal obligations, courts may not compel compliance under § 706(1). And, indeed, in Ecology Ctr., Inc. v. United States Forest Serv., 192 F.3d 922 (9th Cir. 1999), the Ninth Circuit refused to grant relief under § 706(1) where the "Forest Service merely failed to conduct its duty in strict conformance with [a Forest] Plan and NFMA Regulations."[13] Id. at 926.

However, with all due respect, we find the Ninth Circuit's analysis on this point unpersuasive. First, in Ecology Center, the Ninth Circuit refused to compel the Forest Service to conduct monitoring activities in strict compliance with a

_____

[12]Imagine, for example, that applicable federal law prohibited logging in a national forest, yet the BLM only prohibited logging on half the forest, permitting, for one reason or another, logging on the remaining half. The logic of the BLM's argument would have us hold that, because the BLM successfully prevented logging on half, it could not be ordered to prevent logging on the remaining half, notwithstanding the BLM's failure to satisfy its legal obligation to prevent logging in the forest.

[13]The Recreationists also cite to the Fifth Circuit case of Sierra Club v. Peterson, 228 F.3d 559 (5th Cir. 2000) (en banc). However, we do not believe that case supports the BLM's position. Rather, it essentially held that the plaintiffs' effort to enforce the Forest Service's monitoring obligations was not justiciable. Id. at 566-68 & n.11. There is no suggestion in that case that jurisdiction over the monitoring claim failed because of partial monitoring activity by the Forest Service.

forest plan and federal regulations because doing so "would discourage the Forest Service from producing ambitious forest plans." 192 F.3d at 926. Whether requiring a federal agency to comply with its own regulations would discourage that agency from enacting the regulations in the first place, however, is irrelevant for § 706(1) purposes. Our inquiry under §706(1) is not whether, as a policy matter, particular outcomes would be encouraged or discouraged, but whether the agency has unlawfully withheld or unreasonably delayed a legally required, nondiscretionary duty. Cf. Forest Guardians, 174 F.3d at 1187-88 (explaining that § 706(1) requires a court to compel agency action once it has determined that the agency had withheld a legally required duty). Further, the court in Ecology Center viewed the monitoring activity as merely precursor data-gathering activity to support later planned final agency action in amending or revising a forest plan. By contrast, here the nonimpairment mandate obligation of the BLM is a discrete obligation having independent significance apart from any further final agency action.

Ecology Center also quoted the D.C. Circuit's decision in Public Citizen v. Nuclear Regulatory Comm'n, 845 F.2d 1105 (D.C. Cir. 1988), warning that "[a]lmost any objection to agency action can be dressed up as an agency's failure to act" and cautioning courts against entertaining § 706(1) suits where an agency has taken some action. 845 F.2d at 1108. We find, however, that Public Citizen

is readily distinguishable. At issue in Public Citizen was the Nuclear Regulatory Commission's issuance of nonbinding regulations "for the training and qualifications of nuclear power plant personnel." Id. at 1106. A relevant federal statute required the agency to issue binding regulations, and the appellant in that case sued, seeking to compel the agency to issue binding regulations. Id. Applicable federal statutes, however, required the appellant to bring suit challenging final agency actions or an alleged failure to act within, at most, 180 days of the agency's decision or inaction, a deadline the appellant clearly missed if measured by the issuance of the nonbinding regulations. Id. at 1107. Consequently, the issue directly before the D.C. Circuit was not whether the agency's issuance of nonbinding regulations insulated it from § 706(1) review, but whether the issuance of the nonbinding regulations was sufficient action to start the running of the 180-day statute of limitations period, notwithstanding the nonbinding nature of the regulations. The D.C. Circuit found the nonbinding regulations were "a formal product of the Commission, published in the Federal Register, and expressly stat[ed] [by the agency] that it is responsive to the mandate of the Nuclear Waste Policy Act." Id. at 1108. Thus, by the clear statement of the agency itself, the issuance of the nonbinding regulations was intended to be final agency action, which triggered the running of the statute of limitations. The statute of limitations could not be circumvented merely by

arguing that the agency's performance was inadequate and thus should be considered an ongoing failure to act, resulting in an ever-green cause of action for failure to act.

The situation in the case before us is totally different. Here, it is alleged that the BLM is in ongoing violation of a duty to prevent impairment of the WSAs. That is an independent duty, and the BLM is not asserting that it has taken final agency action that should have triggered a statute of limitations barring SUWA's claim. We, therefore, disagree with the notion that <u>Public Citizen</u> stands for the proposition that any time an agency takes some steps toward fulfilling a legal obligation, it is insulated from § 706(1) review.

<u>Nevada v. Watkins</u>, 939 F.2d 710 (9th Cir. 1991), another Ninth Circuit decision cited by the BLM, also is inapposite. The court there simply held that the issuance of preliminary guidelines for evaluating a nuclear waste disposal site was not a final agency action because Congress, in the Nuclear Waste Policy Act, declared that such conduct should not be deemed final agency action. <u>Id.</u> at 714 n.11. Obviously, we have no such clear congressional determination here. Accordingly, we reject the BLM's contention that, because it has taken some steps to address impairment caused by ORV use, it is immune from § 706(1)

review.[14]

## D. Conclusion Regarding FLPMA Claim

In summary, we find that the BLM has a mandatory, nondiscretionary duty to prevent the impairment of WSAs, and in this case, as the district court acknowledged in its decision, SUWA's complaint presents colorable evidence suggesting that ongoing ORV use has or is impairing the disputed WSAs' wilderness values, possibly in violation of the FLPMA's nonimpairment mandate. The fact that the BLM could, in theory, prevent the allegedly impairing ORV use through means other than a final agency action, and that the BLM is taking some steps to prevent ORV-induced impairment, does not deprive the district court of subject matter jurisdiction under § 706(1) to consider the issue. Therefore, we reverse the district court's conclusion that it lacked subject matter jurisdiction over SUWA's impairment claims. On remand, the district court, giving appropriate deference to the IMP's definition of impairment, must determine whether the BLM has, in fact, failed to comply with the FLPMA's the nonimpairment mandate.

---

[14]This is not to suggest that the agency's attempted compliance is totally irrelevant to § 706(1) proceedings. In Forest Guardians, for example, we rejected the argument that budgetary constraints could excuse the Secretary of Interior's "fail[ure] to perform a non-discretionary duty." 174 F.3d at 1191. Nonetheless, we held that budgetary constraints could be considered when deciding what remedy the court should impose for the alleged violation or whether the Secretary should be held in contempt. Id.

IV. Duties under the Land Use Plans

SUWA also alleges on appeal that the BLM failed to carry out a mandatory duty to manage several areas "in accordance with [their] land use plans."

The district court dismissed the SUWA's LUP-based claims on two grounds. The district court reasoned on the one hand that, under relevant regulations, compliance with forest management plans is "limited only to affirmative projects either approved or undertaken after the RMP is in place; [the applicable regulation] does not require that further planning activities contemplated by the plan actually take place." Because SUWA's complaint did not focus on "some site-specific action," the district court concluded that the BLM could not be compelled under § 706(1) to comply with the "monitoring" and ORV-implementation plans promised in LUPs. Alternatively, the district court explained, SUWA's claims were simply a challenge to "the sufficiency of [the] BLM's actions, rather than a failure to carry out a clear ministerial duty."

On appeal, the BLM urges us to affirm based on the reasons identified by the district court. In addition, the BLM argues that LUPs do not create mandatory, nondiscretionary duties because LUPs "are not Congressional mandates, and they are subject to contingencies, such as availability of funds, personnel and the presence of competing priorities." We find the arguments articulated by the BLM and the district court unpersuasive.

-28-

## A. LUPs

The FLPMA requires the Department of the Interior and the BLM to "manage the public lands . . . in accordance with the land use plans [LUPs] developed . . . under section 1712 [of the FLPMA]." 43 U.S.C. § 1732(a). Section 1712, in turn, identifies a number of criteria and concerns that must be taken into account in developing LUPs. Id. § 1712(a), (c); see also 43 C.F.R. § 1610.2 (discussing public participation in LUPs).

At issue in this case are the LUPs for lands characterized as the "Factory Butte and San Rafael areas." It is undisputed that in 1990, an LUP identified Factory Butte as a region requiring special monitoring for ORV use, stated that the "[t]he area will be monitored and closed if warranted," and indicated that "[r]esource damage will be documented and recommendations made for corrective action." The BLM acknowledges that between 1990 and 2000 it did not fully comply with the Factory Butte monitoring pledge. In particular, it failed to maintain a monitoring supervision file specified in the LUP.

In 1991, the BLM created the San Rafael LUP, which called for designation of ORV trails "following completion of an ORV implementation plan," which was scheduled to be completed within one year of the LUP's approval. In turn, the ORV implementation plan was to develop criteria for determining what areas in San Rafael would be open to ORV use. During the course of the litigation, the

BLM admitted that it prepared an ORV implementation plan on October 6, 1997, but that it had been only partially implemented.

## B.  LUP Claim

As an initial matter, we reject the BLM's contention that it did not have a mandatory, nondiscretionary duty to carry out the activities described in the disputed LUPs.  The Factory Butte and San Rafael LUPs declare that Factory Butte "will be monitored" for ORV use and that an ORV implementation plan for San Rafael "will be developed."  The FLPMA, in turn, unequivocally states that "[t]he Secretary shall manage the public lands . . . in accordance with the land use plans developed by him."  43 U.S.C. § 1732(a); see also Pub. Lands Council v. Babbitt, 167 F.3d 1287, 1299 (10th Cir. 1999) (noting how the BLM "shall manage" lands in accordance with LUPs); Natural Res. Def. Council, Inc. v. Hodel, 618 F. Supp. 848, 858 (E.D. Cal. 1985) (same).  Relevant regulations similarly provide that the BLM "will adhere to the terms, conditions, and decisions of officially approved and adopted resource related plans."  43 C.F.R. § 1601.0-5(c).  Therefore, a straightforward reading of the relevant LUPs, as well as applicable statutes and regulations, suggests that the BLM must carry out specific activities promised in LUPs.

It is true, as the BLM and the Recreationists argue, that Congress intended LUPs to be dynamic documents, capable of adjusting to new circumstances and

situations.  See H.R. Rep. No. 94-1163, at 5 (1976), reprinted in 1976 U.S.C.C.A.N. 6175, 6179, quoted in Natural Res. Def. Council, Inc. v. Hodel, 624 F. Supp. 1045, 1059 (D. Nev. 1985) ("The term 'land use planning' is not defined in [the] bill because it is a term now in general usage and permits a large variety of techniques and procedures and various alternatives.").  The BLM can draft LUPs in a way that optimizes the agency's ability to respond to changing circumstances and conditions.  However, the BLM cannot "ignore the requirements of the Forest Plan."[15]  Sierra Club v. Martin, 168 F.3d 1, 4 (11th Cir.

---

[15]The BLM invokes the Supreme Court's decision in Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998), to support its claim that courts cannot compel compliance with LUPs under § 706(1) because "agency plans are programmatic planning documents which are subject to continual review and refinement."  We find Ohio Forestry inapposite.  Ohio Forestry does not stand for the proposition that the Forest Service cannot be compelled to conform its current conduct to LUPs.  Rather, the Court held in Ohio Forestry that an environmental interest group's challenge to a forest plan allowing logging within a national forest was not ripe because, before any logging could occur, the Forest Service had to "focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court."  523 U.S. at 734.  Contrary to the BLM's argument that Ohio Forestry held that a forest plan was merely a planning document with no legal effect, the Supreme Court said that "in [the] absence of [Plan authorization] logging could not take place."  Id. at 730; see also Trent Baker, Judicial Enforcement of Forest Plans in the Wake of Ohio Forestry, 21 Pub. Land & Resources. L. Rev. 81, 107 (2000) (explaining that, even after Ohio Forestry, "agency decisions to ignore their own regulations are reviewable under the APA as final agency actions or failures to act").  Further, the plan provisions under review in Ohio Forestry, unlike the Plan provision being asserted here, do not purport to establish immediate obligations on the Forest Service but only set forth broad preconditions for further action.

1999); see also Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1376-77 (9th Cir. 1998) (same); Ore. Natural Res. Council Action v. United States Forest Serv., 59 F. Supp. 2d 1085, 1094-95 (W.D. Wash. 1999) (same). Similarly, the BLM's right (in accordance with applicable environmental statutes, such as NEPA) to amend or alter existing LUPs does not free the agency from carrying out present obligations. Just as the BLM can be held accountable for failing to act with regard to its nonimpairment duty, it also can be held accountable for failing to act as required by the mandatory duties outlined in an LUP. Therefore, a colorable claim of failing to adhere to LUP duties provides a court with subject matter jurisdiction to consider whether the failure to act warrants relief under § 706(1).

### C. Future Action Argument

We also find unconvincing the BLM's claims that it is required to comply with the mandates of a LUP only when it undertakes a future, site-specific project. Undeniably, many federal lawsuits involving forest plans arise when a federal agency authorizes a particular action within a forest without complying with specific plan requirements. See, e.g., Sierra Club v. Martin, 168 F.3d 1, 3 (11th Cir. 1999); Utah Envtl. Cong. v. Zieroth, 190 F. Supp. 2d 1265, 1268 (D. Utah 2002); Forest Guardians v. United States Forest Serv., 180 F. Supp. 2d 1273, 1277-78 (D.N.M. 2001). Nothing in the FLPMA, however, indicates that the

-32-

BLM is required to comply with LUPs only when it undertakes some future, site-specific action. Some Plan provisions may only restrict future, site-specific action, see Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998), while other Plan provisions may restrict the agency's ongoing conduct or impose immediate duties on the agency even in the absence of future, site-specific proposals. As to the latter provisions, such as the ones at issue here, they have by their own terms immediate effect on the BLM. As discussed above, the FLPMA simply and straightforwardly declares, "[t]he Secretary shall manage the public lands . . . in accordance with the land use plans developed by him." 43 U.S.C. § 1732(a); see also Public Lands Council, 167 F.3d at 1299 (noting how the BLM "shall manage" lands in accordance with LUPs). It does not suggest that management "in accordance" with LUPs will occur only when some discrete post-plan action occurs, or that the BLM is not obligated to follow through on and carry out specific actions, such as monitoring for ORV use, promised in a LUP. Likewise, some regulations suggest that the BLM must comply the LUP requirements. See 43 C.F.R. § 1601.0-5(c) (explaining that the BLM "will adhere to the terms, conditions, and decisions of officially approved and adopted resource related plans").

The BLM invokes certain regulatory provisions that state that future management actions must conform to approved plans. See 43 C.F.R. § 1610.5-

-33-

3(a); see also 43 C.F.R. § 1601.0-2. However, those regulations do not in any manner suggest that the BLM is relieved from implementing ongoing actions if they are specifically promised in the LUP itself. The BLM suggests that inaction cannot constitute a violation of a LUP. But the failure to implement a program specifically promised in an LUP carries the same effect as if the agency had taken an "affirmative" or "future" action in direct defiance of its LUP obligations. Cf. Coalition for Sustainable Res., 259 F.3d at 1251; Thomas, 828 F.2d at 793. As such, a court may compel the BLM to carry out a duty imposed by an LUP that has been unreasonably delayed or unlawfully withheld.[16] See Martin, 168 F.3d at 4.

Accordingly, we reverse the district court to the extent it dismissed SUWA's LUP-based claims on the ground that the BLM's obligation to comply with LUP is only triggered by "some [future] site-specific action taken by the BLM."

---

[16]The BLM's refusal to adhere to promised monitoring programs, such as those discussed in the Factory Butte LUP, is in tension with regulations mandating that LUPs "establish intervals and standards, as appropriate, for monitoring and evaluation of the plan" and that forest managers "shall be responsible for monitoring and evaluating the plan in accordance with the established intervals and standards." 43 C.F.R. § 1610.4-9.

## D. Partial Compliance

For the reasons outlined in our discussion of SUWA's nonimpairment claims, we also reverse the district court's conclusion that the BLM cannot be compelled under § 706(1) to comply with the LUP requirements because, "while the BLM's actions have not been carried out to the letter [of the LUPs], there has not been a complete failure to perform a legally required duty that would trigger review under § 706(1)." As previously explained, partial efforts toward completing a legally required duty do not prevent a court from compelling action under § 706(1). However, when the district court reviews the merits on remand, it can take into account the LUP's mechanism for addressing changing circumstances and conditions in determining the scope of the duties involved and the agency's attempted compliance.[17]

---

[17]On appeal, there has been some suggestion by the parties that SUWA's LUP claims, particularly with regard to the Factory Butte area, are now moot because the BLM implemented the LUP requirements after SUWA instituted the present litigation. On remand, the district court should consider whether some or all of the SUWA's LUP-based claims are moot, though we note that the Supreme Court has cautioned against finding a claim moot where a party ends the challenged, allegedly illegal conduct after the filing of a lawsuit, unless it is "*absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur." Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000) (emphasis in original, internal quotation marks omitted); see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000) (same).

## E. LUP Conclusion

In summary, we find that the district court improperly dismissed SUWA's LUP-based claims for want of subject matter jurisdiction. Contrary to the suggestions of the district court and the BLM, we hold that the BLM did have a mandatory, nondiscretionary duty to comply with the Factory Butte LUP's ORV-monitoring provision and the San Rafael LUP's ORV-implementation provision. We reject the BLM's arguments that (1) LUPs cannot impose mandatory, nondiscretionary duties and/or (2) can only impose mandatory duties when an affirmative, future, and site-specific action occurs. And, for reasons previously discussed, we reject the suggestion that the BLM's efforts towards compliance with the LUP obligations, delayed for over a decade, preclude § 706(1) review.


## V. NEPA

The third issue presented on appeal centers around the National Environmental Policy Act (NEPA) and the BLM's alleged failure to take a "hard look" at information suggesting that ORV use has substantially increased since the NEPA studies for the disputed areas were issued. SUWA contends that, under § 706(1), the BLM should be compelled to take a hard look at this information to decide whether a supplemental environmental impact statement (SEIS) or supplemental environmental assessments should be prepared for certain affected

-36-

areas. In particular, SUWA argues that the BLM's most recent NEPA analyses for the San Rafael Swell, Parunuweap, Behind the Rocks, and Indian Creek areas are dated and do not account adequately for recent increases in ORV activity.[18]

The BLM argues that it should not be compelled to take a hard look at the increased ORV use because it is "planning to conduct NEPA analysis of the nature of impacts of current levels of OHV use in all [the relevant] areas within the next several years," subject to resource constraints. The BLM further argues that SUWA failed to raise its "hard look" argument before the district court, instead "resting only on [the] BLM's alleged 'failure to produce supplemental environmental impact statements.'" Significantly, the BLM does not directly dispute on appeal that the alleged ORV use requires a hard look, and it concedes that, "on a nation-wide level, it needs to revise many of its land management plans."

In its discussion of SUWA's NEPA claim, the district court initially acknowledged that SUWA was seeking to compel the BLM to take a "hard look" at the ORV information. Yet it then rejected SUWA's hard look claim on the ground that a court could not compel the BLM to prepare supplemental NEPA

---

[18]SUWA specifically challenges a 1990 environmental assessment (EA) for the Henry Mountains area, a 1991 EIS for the San Rafael Swell area, a 1980 EA for the Parunuweap area, a 1985 EA for the Behind the Rocks area, and a 1991 EIS for the Indian Creek area.

analyses based on the present record, suggesting in the process that SUWA was seeking to compel the production of a SEIS.

For the reasons discussed below, we believe that the district court misinterpreted SUWA's claim and applied the wrong analysis, and we find that the BLM's arguments for affirming the district court's ruling unconvincing. Consequently, we reverse the district court's decision.

A.  Supplemental Analysis under NEPA

Under NEPA, "'major Federal actions significantly affecting the quality of the human environment' must be preceded by an environmental impact statement or EIS." Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1521 (10th Cir. 1992) (citation omitted).  Before creating an EIS, however, a government agency may prepare a document called an environmental assessment (EA). Friends of the Bow v. Thompson, 124 F.3d 1210, 1214 (10th Cir. 1997).  If after preparing the EA, the agency concludes that a proposed action will not significantly affect the environment, the agency may issue a "finding of no significant impact" (FONSI) and "need not prepare a full EIS."  Id.; see 40 C.F.R. § 1501.4(e).  The primary goal of NEPA is to make sure a government agency carefully gathers and evaluates relevant information about the potential impact of a proposed agency action on the environment and that this information is made available to the public.  Robertson v. Methow Valley Citizens Council, 490 U.S.

332, 349 (1989); see also 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.").  NEPA does not require an agency to reach a particular substantive outcome.  Marsh v. Ore. Natural Res. Council, 490 U.S. 360, 371 (1989); Envtl. Def. Fund, Inc. v. Andrus, 619 F.2d 1368, 1374 (10th Cir. 1980).

Due to this emphasis on informed decisionmaking, federal regulations require government agencies to prepare an SEIS or a supplemental EA (1) if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or (2) "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" arise.[19]  40 C.F.R. § 1502.9(c)(i)-(ii); see also Marsh, 490 U.S. at 372-73; Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1177-78 (10th Cir. 1999).  As the Supreme Court explained, "It would be incongruous with th[e] approach to environmental protection . . . for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval."  Marsh, 490 U.S. at 371.

---

[19]The standard for preparing a supplemental EA is the same as for preparing an SEIS.  See Idaho Sporting Cong., Inc. v. Alexander, 222 F.3d at 566 & n.2 (9th Cir. 2000); Friends of the Bow, 124 F.3d at 1218 & n.3.

This court and the Supreme Court have recognized, however, that an agency does not have to supplement an EIS or an EA "every time new information comes to light." Id. at 373; Friends of the Bow, 124 F.3d at 1218 (quoting Marsh). "To require otherwise," the Supreme Court has observed, "would render agency decisionmaking intractable, always awaiting updated information only to find new information outdated by the time a decision is made." Marsh, 490 U.S. at 373. Instead, "[t]he issue is whether the subsequent information raises new concerns of sufficient gravity such that another, formal in-depth look at the environmental consequences of the proposed action is necessary." Wisconsin v. Weinberger, 745 F.2d 412, 418 (7th Cir. 1984); see also S. Trenton Residents Against 29 v. Fed. Highway Admin., 176 F.3d 658, 663-64 (3d Cir. 1999) (same).

In evaluating an agency's decision not to develop a SEIS or supplemental EA, courts utilize a two part test. First, they look to see if the agency took a "'hard look' at the new information to determine whether [supplemental NEPA analysis] is necessary." Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist., 914 F.2d 1174, 1777 (9th Cir. 1990); see also Marsh, 490 U.S. at 374; Hughes River Watershed Conservancy v. Johnson, 165 F.3d 283, 286 (4th Cir. 1999). In applying the hard look test, courts may consider whether the agency "obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny, [] responds to all legitimate concerns

that are raised," Hughes River, 165 F.3d at 288 (citing Marsh, 490 U.S. at 378-85), or otherwise provides a reasoned explanation for the new circumstance's lack of significance. Second, after a court determines that an agency took the requisite "hard look," it reviews an agency's decision not to issue an SEIS or a supplemental EA under the APA's arbitrary and capricious standard. Marsh, 490 U.S. at 377; Colo. Envtl. Coalition, 185 F.3d at 1178; Friends of the Bow, 124 F.3d at 1218; Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 443 (4th Cir. 1996).

## B. Hardlook Claim

Turning to the merits of the parties' arguments, we initially conclude that SUWA properly raised its "hard look" claim before the district court. A review of the district court proceedings indicates that SUWA claimed that the "BLM's failure to take [a] 'hard look' . . . is a clear violation of NEPA's requirements." In advancing this argument, SUWA distinguished the first step of supplemental NEPA review (whether an agency took a hard look at new information) from the second step (whether the agency acted arbitrarily and capriciously in not issuing an SEIS or a supplemental EA) and made clear it was challenging the BLM's failure to take a "hard look," not whether the BLM acted arbitrarily and capriciously in refusing to prepare a supplemental NEPA analysis. While SUWA did include a rhetorical flourish suggesting that "should the agency take the

-41-

required hard look, the inescapable conclusion of that analysis must be that the 'new circumstances' . . . require supplemental NEPA," the BLM apparently recognized that SUWA was asserting a "failure to take a 'hard look'" claim and responded accordingly. Consequently, we conclude that SUWA adequately raised and preserved its claim that the BLM should be compelled to take a hard look at new information suggesting "significant new circumstances . . . relevant to environmental concerns and bearing" on its management of the disputed lands. 40 C.F.R. § 1502.9(c)(i)-(ii). Further, we conclude the district court erred by resolving SUWA's claim on the ground that, based on the evidence currently before it, an actual SEIS or supplemental EA could not be ordered.

## C. Future NEPA Action

We also believe that the BLM is misguided in claiming that because it will be undertaking NEPA analysis in the near future, a court cannot, or, at the very least, should not, require it to take a hard look at the increased ORV use. The BLM's assertion that it hopes to fulfill, or even will fulfill, its NEPA obligations in the future does not address its current failures to act. Cf. Portland Audubon Soc'y v. Babbitt, 998 F.2d 705, 709 (9th Cir. 1993) ("[W]e are unmoved by the Secretary's claim that it would be futile to prepare supplemental EISs . . . when its new Resources Management Plans and accompanying EISs will address all the relevant information.").

Similarly, the BLM's claim that it should not be compelled to take a hard look at present ORV use because it faces budget constraints and because requiring such a review "would only divert BLM's resources from its current and planned NEPA work" is unavailing. The BLM's budgetary argument wrongly conflates financial constraints with the legal issue in this case: whether the BLM is required to take a hard look at increased ORV use under NEPA. An agency's lack of resources to carry out its mandatory duties, we have reasoned, does not preclude a court from compelling action under § 706(1). Forest Guardians, 174 F.3d at 1189 n.14 (holding that the unavailability of resources cannot be used as a defense against an action to compel an agency to carry out its mandatory, nondiscretionary duties); see also id. at 1192 ("Wisely, the Secretary does not press the argument that inadequate congressional appropriations relieved him of his ESA duties. We could not accept that argument if it had been raised. . . ."). Instead, we have explained, an inadequate resource defense must be reserved for any contempt proceedings that might arise if the agency fails to carry out a mandatory duty after being ordered to do so by a court. Id. (expressing sympathy for the resources argument and noting that it "could arise at the contempt stage").

Additionally, we find the BLM's claim that it should not be compelled to take a hard look at increased ORV use because it intends to conduct NEPA reviews in the near future problematic in light of its budget-based arguments.

The BLM's extensive discussion about the budgetary woes confronting it, as well as its concession that "limited resources will prevent [the] BLM from undertaking all of its desired [NEPA] planning efforts immediately," raise serious questions about the likelihood of a future hard look actually occurring. Our concern on this score is only increased by the BLM's failure to offer a concrete time table for when its NEPA activities will occur; all the BLM suggests is that further NEPA review will occur over the next "several" or "few" years.

Accordingly, we conclude that the district court erred in concluding that it could not order the BLM to take a hard look at the information presented by SUWA. Cf. Hughes River, 81 F.3d at 446 (concluding that Agency violated NEPA by not taking a hard look at information before declining to issue a SEIS).

## VI. Conclusion

In our view, the district court erroneously concluded that because the BLM has taken some steps toward addressing alleged ORV-caused impairment and toward complying with LUP requirements, it lacked subject matter jurisdiction under § 706(1) of the APA. We also find that the district court mistakenly believed that the BLM is only bound by the requirements of LUPs when it undertakes "affirmative, future actions" that conflict with mandatory LUP duties. Finally, we further conclude that the district court misapprehended the nature of

-44-

SUWA's NEPA claim. The alternative grounds for affirming the district court's ruling offered by the BLM, including its claim that unlawfully withheld action may only be compelled under § 706(1) if the withheld action, once carried out, would be considered final agency action, are unpersuasive. Accordingly, we **REVERSE** the district court's decision and **REMAND** for proceedings consistent with this opinion.

**No. 01-4009, Southern Utah Wilderness Alliance et al. v. Norton et al.**

**McKAY, Circuit Judge, concurring in part and dissenting in part:**

While I concur in the result reached by the majority as to Appellants' NEPA claim, I respectfully dissent in all other respects.

### I. Misconstruing the BLM's Nonimpairment Obligation

The court's failure to follow well-established precedent which mandates that we determine the scope of § 706(1) jurisdiction by a mandamus standard leads to its unwarranted conclusion that any mandatory agency obligation is amenable to attack pursuant to § 706(1) of the APA. Maj. op. at 7. The majority opinion does not, and cannot, cite a single case from any court justifying this novel proposition.

Our ability to grant injunctive relief under § 706(1) is governed by a standard similar to the one used in evaluating requests for mandamus relief. See Mount Emmons Mining Co. v. Babbitt, 117 F.3d 1167, 1170 (10th Cir. 1997); Independence Mining Co., Inc. v. Babbitt, 105 F.3d 502, 507 (9th Cir. 1997). "Mandamus relief is an appropriate remedy to compel an administrative agency to act where it has failed to perform a nondiscretionary, *ministerial* duty." Marathon Oil Co. v. Lujan, 937 F.2d 498, 500 (10th Cir. 1991) (citations omitted) (emphasis added). In § 706(1) actions, plaintiffs must demonstrate either "agency recalcitrance [] in the face of [a] clear statutory duty[, or agency recalcitrance] 'of

such a magnitude that it amounts to an abdication of statutory responsibility . . . .'" ONRC Action v. BLM, 150 F.3d 1132, 1137 (quoting Public Citizen Health Research Group v. Comm'r, Food & Drug Admin., 740 F.2d 21, 32 (D.C. Cir. 1984).

I agree with the majority that BLM's FLPMA obligation is both mandatory and continuous. This observation, however, reveals but a portion of Appellees' burden in establishing jurisdiction pursuant to § 706(1). Because we employ a mandamus standard when evaluating § 706(1) jurisdiction, § 706(1) plaintiffs must also prove that they are challenging a *ministerial* agency obligation. See Marathon Oil, 937 F.2d at 500. Ministerial is defined as "an act that a person after ascertaining the existence of a specified state of facts performs in obedience to a mandate of legal authority *without the exercise of personal judgment upon the propriety of the act and usually without discretion in its performance . . . .*" Webster's Third New Int'l Dictionary (1986) (emphasis added). The BLM's nonimpairment FLPMA obligation is not remotely ministerial.

The majority concedes the well-settled rule that the propriety of jurisdiction pursuant to § 706(1) must be determined in accordance with our mandamus jurisprudence. Maj. op. at 12-13, n.6. The majority also concedes that the BLM's nonimpairment obligation is generally stated and involves a substantial amount of discretion in the manner in which the BLM meets its obligation. Id. at 14.

Despite conceding the very points that establish the fact that the BLM's FLPMA nonimpairment duty is not ministerial is nature, the majority's opinion nonetheless maintains that Appellants may challenge the BLM's alleged failure to meet its nonimpairment obligation pursuant to § 706(1)'s provisions.[1]

Despite recognizing, as it must, that § 706(1) jurisdiction is properly analyzed under our mandamus jurisprudence, the thrust of the majority's position is that any mandatory duty, regardless of how generally stated and regardless of the amount of discretion given to the agency in the performance of its duty, is challengeable pursuant to § 706(1). Additionally, the majority in no way limits its novel interpretation of § 706(1) jurisdiction to the environmental field. Apparently, as set out in the majority opinion, any mandatory obligation of any United States agency could be challenged using § 706(1) as a jurisdictional basis.

The majority's position ignores reality by placing all agency obligations, regardless of the discretion granted to the agency in carrying out the particular obligation, into one category–mandatory obligations. Statutory directives by their nature are mandatory. I have yet to discover a single statute indicating that an

---

[1]The requirement that the agency's obligation be ministerial in nature has also been expressed as a requirement that the agency's obligation be "a plainly defined and preemptory duty." Hadley Mem'l Hosp., Inc. v. Schweiker, 689 F.2d 905, 912 (10th Cir. 1982) (citations omitted). The BLM's nonimpairment obligation simply cannot be viewed as either ministerial or a plainly defined and preemptory duty.

agency's obligation is anything other than mandatory. The reality is that the various mandatory obligations given to agencies are properly viewed on a continuum. On one end are agency obligations that are programmatic in nature, i.e., the BLM's nonimpairment duty. The other end of the continuum represents discrete tasks the agency must perform in order to carry out a portion of its overall duties, i.e., processing a mineral application. The latter are properly challengeable pursuant to § 706(1); the former are not.

The majority's position directly contradicts the Supreme Court's mandate that review under the APA is strictly reserved for cases addressing *specific instances* of agency action or inaction rather than programmatic attacks. See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 891-94 (1990). Plaintiffs "cannot seek *wholesale* improvement of [an agency] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." Id. at 891 (emphasis in original). In sum, § 706(1) of the APA cannot be used as a jurisdictional vehicle for claims challenging an agency's overall method of administration or for controlling the agency's day-to-day activities.[2]

_____

[2]The Supreme Court observed that

> [t]he case-by-case approach . . . require[d] is understandably
> frustrating to an organization such as respondent, which has as its

(continued...)

-4-

The problem with the majority's position is revealed through the use of a simple example. The Immigration and Naturalization Service has a mandatory, ongoing, and continuous obligation to "enforce the Immigration and Nationality Act and all other laws relating to the immigration and naturalization of aliens."[3]

---

[2](...continued)
objective across-the-board protection of our Nation's wildlife . . . . But this is the traditional, and remains the normal, mode of operation of the courts. . . . Assuredly[, it is] not as swift or as immediately far-reaching a corrective process as those interested in systematic improvement would desire. Until confided to us, however, more sweeping actions are for the other branches.

National Wildlife Fed'n, 497 U.S. at 894. "Courts are not equipped, nor are they the proper body, to resolve the technical issues involved in agency decisionmaking at 'a higher level of generality.'" Sierra Club v. Peterson, 228 F.3d 559, 569 (5th Cir. 2000) (citing National Wildlife Fed'n, 497 U.S. at 894). Few, if any, of the BLM's obligations are expressed at a higher level of generality than the BLM's nonimpairment duty pursuant to FLPMA.

[3]There are a host of mandatory, ongoing, continuous agency obligations that are now subject to attack pursuant to the majority's view of § 706(1) jurisdiction. Another example is the Fish and Wildlife Service's obligation to utilize its authority to "seek to conserve endangered species and threatened species." See 16 U.S.C. § 1531(c)(1) (2000) (declaring Congress' policy that all federal departments and agencies have an obligation to protect endangered species). The majority offers no explanation to differentiate the mandatory, ongoing, and continuous nature of such agency obligations from the BLM's nonimpairment obligation established by FLPMA. Thus, the majority's view of § 706(1) exposes agencies to attack by plaintiffs who believe that the INS is not properly enforcing all of the immigration laws or that the Fish and Wildlife Service is not sufficiently utilizing its authority to seek and conserve endangered species. Rather than preserve our WSAs (or ensure the INS enforces all of the immigration laws or that the Fish and Wildlife Service utilizes its authority to conserve endangered species) the majority's view of § 706(1) jurisdiction improperly permits plaintiffs unsatisfied with the day-to-day operations of various

(continued...)

8 C.F.R. § 2.1 (2002). Applying the court's apparent conclusion that any mandatory duty can be challenged pursuant to § 706(1), the failure of the INS to enforce the immigration laws could be properly challenged pursuant to § 706(1). Thus, any individual unhappy with the INS' efforts to prevent the entry of all illegal aliens (despite the laws prohibiting the entry of illegal aliens and the INS' duty to enforce these laws) could bring a lawsuit pursuant to § 706(1) for the INS' "failure to act." Despite our prior case law holding to the contrary, nothing in the majority opinion would constrain the granting of a writ of mandamus ordering the INS to enforce the immigration laws. See, e.g., Smith v. Plati, 258 F.3d 1167, 1179 (10th Cir. 2001) (mandamus "not ordinarily granted to compel police officers to enforce the criminal laws") (quotation omitted). The majority's novel interpretation of § 706(1)'s jurisdictional scope permits exactly this incongruous result.

This expanded view of § 706(1) jurisdiction becomes even more apparent when considering the potential remedies available to plaintiffs challenging any mandatory agency obligation. Our prior cases reveal that when we grant a writ of mandamus, the remedy provided within the writ guarantees correction of the error petitioner claimed in the first instance. The writ's ability to correct the problem

---

[3](...continued)
government agencies to attempt to control these operations through litigation.

complained of necessarily requires that the duty challenged be ministerial in nature. See, e.g., Hulsey v. West, 966 F.2d 579, 582-83 (10th Cir. 1992) (mandamus granted ordering the district court to ensure petitioner's right to jury trial); McNeil v. Guthrie, 945 F.2d 1163, 1168 (10th Cir. 1991) (mandamus granted requiring district court clerk to file pro se papers in class action suit); Journal Publ'g. Co. v. Mechem, 801 F.2d 1233, 1237 (10th Cir. 1986) (mandamus writ issued ordering district court to dissolve previous order regarding press contact with jury pool that was over broad); Hustler Magazine, Inc. v. United States Dist. Court, 790 F.2d 69, 71 (10th Cir. 1986) (mandamus writ issued requiring district court to conduct a "full and adequate hearing" regarding motion to change venue); Herrera v. Payne, 673 F.2d 307, 308 (10th Cir. 1982) (mandamus writ issued compelling district court to attach statement of reasons in order denying a certificate of probable cause as required by Fed. R. App. P. 22(b)).

A similar result occurs when a remedy is granted in a suit brought against agencies for a failure to act pursuant to § 706(1). See, e.g., Forest Guardians v. Babbitt, 174 F.3d 1178, 1192 (10th Cir. 1999) (compelling agency to designate a critical habitat for the silvery minnow); Yu v. Brown, 36 F. Supp. 2d 922, 931 (D.N.M. 1999) (compelling INS to process plaintiff's application for special immigrant juvenile status). On remand, I can think of no remedy the district court

could construct that would guarantee a correction of the agency failure alleged in the first instance–BLM's full compliance with its nonimpairment duty. At most and at worst, the remedy granted would involve the district court in the ongoing review of every management decision allegedly threatening achievement of the nonimpairment mandate. Quite simply, even if ORV use was entirely banned inside WSAs, the BLM's compliance with such a remedy still would not guarantee that the WSAs would not be impaired in the future.

The majority's opinion essentially transforms § 706(1) into an improper and powerful jurisdictional vehicle to make programmatic attacks on day-to-day agency operations. The Supreme Court has specifically rejected this approach. See National Wildlife Fed'n, 497 U.S. at 894 (APA improper method of making programmatic attacks on agency obligations).

## II. Unwarranted Expansion of "Failure to Act"

In addition to an unwarranted expansion of § 706(1) threshold jurisdiction, the majority opinion compounds its error by improperly expanding the definition of § 706(1)'s failure to act requirement to include not only true agency inaction but also all agency action which falls short of completely achieving the agency's obligations. This unique interpretation of "failure to act" incorrectly conflates the concepts of action and achievement. Once again, I do not dispute that the BLM must comply with its nonimpairment mandate and must manage WSAs in a

-8-

manner that prevents impairment. For § 706(1) jurisdictional purposes, however, this is not the issue. Instead, the issue is whether Appellants may use § 706(1) to challenge an agency's failure to completely comply with its obligations as a "failure to act." The facts in this case do not support such a conclusion.

Because nearly every objection to agency action could be cleverly pleaded as agency inaction, § 706(1) jurisdiction exists "only when there has been a genuine *failure* to act." Ecology Ctr., Inc. v. United States Forest Serv., 192 F.3d 922, 926 (9th Cir. 1999); see also Public Citizen v. Nuclear Regulatory Comm'n, 845 F.2d 1105, 1108 (D.C. Cir. 1988) (emphasis added). Complaints about the sufficiency of agency action disguised as failure to act claims are not cognizable pursuant to § 706(1). See Sierra Club v. Peterson, 228 F.3d 559, 568 (5th Cir. 2000); Ecology Ctr., 192 F.3d at 926; Nevada v. Watkins, 939 F.2d 710, 714 n.11 (9th Cir. 1991).

The majority's summation of Appellants' claims reveals the true nature of Appellants' complaint–insufficiency of agency action disguised as a failure to act claim. Appellants assert that the BLM is "not properly managing off-road vehicle and/or off-highway (collectively ORV) use on federal lands that had been classified by the BLM as Wilderness Study Areas." Maj. op. at 3. Appellants' objections are not based upon a true failure to act; instead, they address an alleged failure of the BLM to achieve complete success in its efforts to comply

with the BLM's nonimpairment obligation.[4]  Section 706(1) is unquestionably an inappropriate jurisdictional basis for such claims.  See, e.g., Sierra Club, 228 F.3d at 568; Ecology Ctr., 192 F.3d at 926; Watkins, 939 F.2d at 714.

The majority's assertion that an "agency's attempted compliance is[n't] totally irrelevant to § 706(1) proceedings" misses the mark completely.  Maj. op. at 27, n.14.  Not only is an agency's attempted compliance "not totally irrelevant," it is *the essential* inquiry in determining whether § 706(1) jurisdiction can be properly invoked.  I reiterate that § 706(1) jurisdiction is proper *only* when a plaintiff alleges a true failure to act.  Sierra Club, 228 F.3d at 568; Ecology Ctr., 192 F.3d at 926.  The majority maintains that any action taken by an agency that does not result in complete success in the carrying out of mandatory obligations is properly challengeable as a *failure* to act.  The burden properly placed on § 706(1) plaintiffs is much more rigorous than that.  Plaintiffs must prove a failure of an agency to take *any* action reasonably calculated to achieve

---

[4]The example in footnote twelve of the majority opinion has no application to this case.  It assumes that the BLM is either acting in bad faith or taking final agency action inconsistent with its statutory mandate.  I agree that bad faith attempts to comply with an agency's obligations is equivalent to no action at all.  However, in the present case no one alleges that the BLM is acting in bad faith.

In order to log on BLM lands, permits are required.  Assuming that the land had been set aside for activities other than logging (as the majority does), granting a logging permit would represent a final agency action properly challengeable pursuant to the APA as a final agency decision.  See 5 U.S.C. § 704 (1996).  Section 704, not § 706(1), would provide the proper jurisdictional basis for such a challenge.

the ends of its mandate. It is unrealistic to expect that every agency action taken in good faith will be completely successful. It is even wider of the mark to label good faith agency efforts that fall short of complete success as "failures to act."

### III. Creating a New Agency Obligation

The court's improper disposition of Appellants' land use plan claim is due in part to its erroneous view of the scope of § 706(1) jurisdiction and in part to its creation of a new agency obligation that before today the BLM did not possess. Statutorily, BLM's obligation is to manage its lands "in accordance with the land use plans." 43 U.S.C. §1732(a) (1986). Additionally, 43 C.F.R. §1610.5-3(a) (2001) states that "[a]ll future resource management authorizations and actions . . . and subsequent more detailed or specific planning[] shall conform to the approved plan."

The court asserts that once the BLM develops a land use plan it is required to achieve every single aspect of that plan. It accepts Appellants' argument that allowing the BLM to ignore the affirmative management provisions in its own plans will "make a charade of the BLM land planning, public participation, and NEPA processes." Aplt. Br. at 43. The effect of the majority's opinion is that any failure (regardless of how small) to live up to every aspiration expressed in the BLM's land management plans would entitle Appellants to challenge such failure pursuant to § 706(1).

Correctly viewed, however, the BLM's land plans are aspirational. While the BLM is prevented from approving or undertaking affirmative projects inconsistent with its land use plans, the BLM is not required to meet each and every specific goal set forth in its land use plans or face potential litigation jurisdictionally based on § 706(1) for failing to act. Affirmative projects or final agency decisions inconsistent with land use plans are properly challenged as final agency actions, not as failures to act. Importantly, successful challenges to land use plans have only involved *final* agency decisions made pursuant to existing land use plans. See, e.g., Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1376, 1382 (9th Cir. 1998) (remanding approval of a timber sale not in conformity with forest plan); Oregon Natural Res. Council Action v. United States Forest Serv., 59 F. Supp. 2d 1085, 1097 (W.D. Wa. 1999) (enjoining timber sale approved before completion of wildlife survey as required by the management plan). I was unable to locate a single case supporting the majority's view.

The court's position is belied by the stated purpose of resource management planning, which is to provide "a process for the development, approval, maintenance, *amendment and revision* of resource management plans." 43 C.F.R. § 1601.0-1 (2001) (emphasis added). Thus, the regulations envision plans that are dynamic, flexible, and that properly balance the competing objectives of the

various groups interested in public lands. Requiring an agency to meet every one of its original aspirational objectives denies the intended nature of resource planning. Inherent in the process is the understanding that even well-intended objectives may prove unfruitful in obtaining desired results. Necessarily, a change in approach will be warranted on occasion. Permitting plaintiffs to challenge a land use plan under the guise of a failure to act because each and every objective of the land use plan has not been met would allow plaintiffs of all varieties to substantially impede an agency's day-to-day operations. The Supreme Court has specifically rejected this notion. National Wildlife Fed'n, 497 U.S. at 894 (courts are not the correct place to make programmatic attacks on agencies).

The district court concluded that the BLM's obligation on its face is "limited only to affirmative projects either approved or undertaken after the [Resource Management Plan] is in place; it does not require that further planning activities contemplated by the plan actually take place." Aplt. App. at 865. I agree. The regulations specifically grant a right to challenge an agency decision or amendment that violates a plan's provision. "Any person adversely affected by a specific action *being proposed to implement* some portion of a resource management plan or amendment may appeal such action pursuant to 43 CFR 4.400 at the time the action is proposed for implementation." 43 C.F.R. § 1610.5-3(b) (2001) (emphasis added). The regulations tellingly contain no reference of

-13-

any kind to the rights of an individual to challenge an agency's failure to meet each and every goal set forth in its land use plans.

I have found absolutely no legal support for the proposition that failure to attain all of the goals of a land use plan can properly be challenged pursuant to § 706(1), nor does the majority opinion cite any. It seems odd to me that, if a plaintiff could properly challenge an agency's failure to reach all of its objectives in its land use plans pursuant to § 706(1), not a single plaintiff has ever prevailed in any court on such a theory. Today the court permits Appellants to potentially proceed on a land management plan claim based upon a previously nonexistent agency obligation.

IV. <u>Consequences of the Majority's Approach</u>

The unwarranted and unsupported decision to judicially expand § 706(1) jurisdiction in a way never envisioned by any other court or Congress and the creation of a previously unrecognized agency obligation might be more palatable if the end result of the endeavor promised significant public policy benefits. Unfortunately, I am convinced that the opposite is true. Instead of assisting agencies in the laudable goal of preserving our nation's precious environmental resources, the effect of the court's decision will likely make the successful protection of our environment even more difficult.

Perhaps the most obvious consequence of this expansion of § 706(1)'s

-14-

scope is the future syphoning of scarce BLM (and other agencies') resources intended to meet its worthy objectives and obligations to fund increasing unmerited litigation. However narrowly intended, the court's opinion has opened the floodgates of litigation for plaintiffs to challenge any mandatory agency obligation regardless of the amount of discretion afforded to the agency in carrying out its obligations.

Additionally, today's decision turns the burden of proving jurisdiction on its head. It is well accepted that the burden of proving jurisdiction is properly placed on the party invoking jurisdiction (plaintiffs). See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)(citation omitted). Instead, today's decision requires agency defendants to now prove not only that they have acted but also that their actions have been completely successful, rather than properly placing the burden on plaintiffs to prove an agency's true failure to act.

The additional problem with the court's unique view of § 706(1)'s jurisdictional scope is that it is not amenable to reasonable judicial standards. For example, there is no standard as to the proper time when a plaintiff may challenge an agency's failure to comply one hundred percent with a statutory obligation. If an agency's obligation is viewed as mandatory, continuous, and immediate, nothing here prevents a plaintiff from challenging an agency's failure to successfully and completely comply with its statutory obligation the very next

day.  This unmanageable approach to § 706(1) jurisdiction shifts to the court what amounts to day-to-day supervision of the level of goal achievement under any agency's plan.

In addition to encouraging increasing amounts of unmerited litigation, the logical consequence of this greatly expanded jurisdiction is the creation of ineffective and passive land use plans.  If an agency can be forced into litigation for any failure to completely achieve the goals it sets for itself in its desire to *reach or exceed* its statutory obligation, the agency's likely reaction will be to adopt land use plans that are little more than ambiguous and general restatements of the agency's obligations in the first instance.  Such a result would severely constrain an agency's ability to use its expertise and discretion to protect the environment and would hinder the aggressive and successful management of the WSAs that all parties desire.

In sum, I am of the view that the court today has embraced three novel concepts:  1) the BLM's nonimpairment obligation is a ministerial duty subject to attack pursuant to § 706(1); 2) any failure of the BLM (no matter how slight) may provide jurisdiction for a "failure to act" challenge pursuant to § 706(1); and 3) the BLM's (and other agencies') failure to achieve each and every aspiration of its land use plans with completely successful results opens it to potential litigation for "failing to act."

## IV. Conclusion

Because I view the BLM's nonimpairment obligation pursuant to FLPMA as nonministerial in nature and since only ministerial agency duties are properly subject to attack pursuant to § 706(1)'s provisions, I would affirm the district court's decision to dismiss this claim for lack of jurisdiction. See Marathon Oil, 937 F.2d at 500. I would also affirm the district court's decision to dismiss Appellants' land use plan claim because that claim is based on a non-existent duty. The BLM simply is not required to achieve each and every goal of its aspirational land use plans or have that failure, however slight, be challenged pursuant to § 706(1).

Appellants are not without remedy; but, on the facts of this case, Congress has limited the remedy to that provided by § 706(1). Thus, I do concur with the result the majority reaches in remanding Appellants' NEPA claim to determine whether the BLM has truly failed "to take a 'hard look' at information suggesting that ORV use has substantially increased since the NEPA studies for the disputed areas were issued." Maj. op. at 37.