**PUBLISH**

**May 7, 2019**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UTAH NATIVE PLANT SOCIETY;
GRAND CANYON TRUST,

    Plaintiffs - Appellants,

v.

UNITED STATES FOREST
SERVICE; TOM TIDWELL, in his
official capacity as Chief of the U.S.
Forest Service,

    Defendants - Appellees.

------------------------------------------------

STATE OF UTAH; STATE OF
ALASKA; STATE OF COLORADO;
STATE OF IDAHO; STATE OF
KANSAS; STATE OF NEBRASKA;
STATE OF WYOMING; NEW
MEXICO DEPARTMENT OF GAME
AND FISH; ASSOCIATION OF FISH
AND WILDLIFE AGENCIES,

    Amici Curiae.

No. 17-4074

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:16-CV-00056-PMW)**

Aaron Paul (Neil Levine with him on the briefs), Grand Canyon Trust, Denver, Colorado, for Plaintiffs-Appellants.

Jared C. Bennett, Assistant United States Attorney (John W. Huber, United States Attorney, with him on the brief), Salt Lake City, Utah, for Defendants-Appellees.

Sean D. Reyes, Utah Attorney General, Tyler R. Green, Utah Solicitor General, and Martin B. Bushman and Gregory Hansen, Assistant Utah Attorneys General, Salt Lake City, Utah, filed an Amicus Curiae Brief for the States of Utah, Alaska, Colorado, Idaho, Kansas, Nebraska, and Wyoming, and the New Mexico Department of Game and Fish in support of Defendants-Appellees.

Carol Frampton and Lane Kisonak, Association of Fish and Wildlife Agencies, Washington, D.C., filed an Amicus Curiae Brief for the Association of Fish and Wildlife Agencies in support of Defendants-Appellees.

---

Before **BRISCOE**, **BALDOCK**, and **EID**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

The La Sal Mountain Range, located in southeastern Utah on the Colorado Plateau, encompasses the vast acreage of the Manti-La Sal National Forest. The highest elevations of the national forest support one of the rare alpine communities in the region. At these elevations, sensitive tundra vegetation grows among talus rock and rare plants find their home. To preserve this particular community, Defendant United States Forest Service (FS) in 1988 designated a 2,380 acre portion of the Manti-La Sal National Forest's highest elevations, namely the summits and ridges of Mt. Peale, Mt. Mellenthin, and Mt. Tukuhnikivatz, as the Mt. Peale

2

Research Natural Area (RNA).[1]  According to an FS regulation, an RNA should "illustrate adequately or typify for research or educational purposes, the important forest and range types in each forest region, as well as other plant communities that have special or unique characteristics of scientific interest and importance."  36 C.F.R. § 251.23.  The applicable regulation further provides an RNA "will be retained in a virgin or unmodified condition except where measures are required to maintain a plant community which the area is intended to represent." *Id.*  According to the instant suit, "until 2013, the Forest Service adhered to its rules and preserved the [Mt. Peale RNA] in an unmodified natural state."

Now enter the State of Utah's Division of Wildlife Resources (UDWR), the "wildlife authority for Utah . . . [s]ubject to the broad policymaking authority of the Wildlife Board."  Utah Code Ann. § 23-14-1(1)(b), (2)(a).  In June 2013, the Utah Wildlife Board approved UDWR's "Utah Mountain Goat Statewide Management Plan."  Among other things, UDWR's plan anticipated the release of a target population of 200 mountain goats into the La Sal Mountains adjacent to the Manti-

---

[1]  The boundary of the Mt. Peale RNA runs roughly along the treeline surrounding these three major peaks but in some areas the boundary follows identifiable topographic features such as cliff bands and ridge spurs.  We are told the Manti-La Sal National Forest is home to ten plant species found nowhere else in Utah and one found nowhere else in the world.  The FS has listed four of these plant species, all found within the Mt. Peale RNA, as sensitive.  According to the Forest Service Manual, "sensitive species" are those for which "population viability is a concern."

La Sal National Forest for the express purposes of hunting and viewing. The FS, rightly concerned the goats might adversely affect the habitat of the higher alpine regions of the national forest, responded by asking UDWR to delay implementation of its plan while the FS in coordination with UDWR studied the plan's expected impact on the national forest and the RNA. Unfortunately, UDWR rejected the FS's request for an outright delay. UDWR indicated it would begin implementing its plan by transplanting a small number of goats into the mountains, but would work cooperatively with the FS to assess impacts and develop a strategy to prevent overutilization of the habitat. In September 2013, UDWR released twenty mountain goats on State lands adjacent to the Manti-La Sal National Forest. A year later, UDWR released an additional fifteen mountain goats on the same State lands.

At this point, Plaintiff Grand Canyon Trust (GCT) said enough.[2] The goats, to no one's surprise, had moved into the La Sal Mountains' higher elevations. There, according to GCT, the goats were wallowing and foraging within the national forest and more particularly within the Mt. Peale RNA. Noting ongoing harm to the Mt. Peale RNA and citing 36 C.F.R. § 251.23, GCT demanded the FS (1) prohibit UDWR from introducing additional mountain goats onto State lands adjacent to the

---

[2] GCT's mission is to protect and restore the national forests and canyon country of the Colorado Plateau. GCT's Co-Plaintiff, Utah Native Plant Society, has the arguably narrower but overlapping mission of preserving native plant ecosystems within Utah and the Intermountain West. Hereinafter we refer to the two Plaintiffs collectively as GCT.

national forest, (2) regulate UDWR's occupancy and use of the national forest by requiring it to obtain special use authorization before releasing additional mountain goats on State lands, and (3) immediately remove the mountain goats already in the national forest.

The FS denied GCT any relief, at least for the time being. In a letter to GCT, the Chief of the FS explained "[t]he Forest Service does not regulate or control UDWR's activities that do not occur on NFS [National Forest Service] land, and your request that the Forest Service prevent UDWR from transplanting goats anywhere in the La Sal Mountains is beyond the control of the Forest Service." The Chief further explained UDWR was not required to seek a special use permit to use the national forest before releasing the mountain goats on State lands: "[T]he UDWR did not release the mountain goats on NFS land, and therefore was not using or occupying NFS land at the time of the mountain goats release. The mountain goats have strayed onto adjacent NFS land, including the land within the Mount Peale RNA, after they were released on non-Federal land by UDWR." Lastly, the FS Chief took a "wait and see" attitude with regard to GCT's request that the FS remove or destroy any mountain goats not only in the Mt. Peale RNA but throughout the national forest:

> [T]he Forest Service is working cooperatively with UDWR to evaluate any resource impacts and to determine an appropriate action, including consideration of removal of the mountain goats from the RNA or reduction in herd numbers.
>
> * * *

5

Before initiating any such action, the Forest Service will work with UDWR to gather and evaluate data sufficient to determine whether that action is warranted, and then will work cooperatively with UDWR to determine and implement the appropriate course of action.

GCT's lawsuit for declaratory and injunctive relief followed.

I.

GCT's muddled complaint alleged five "claims for relief" against the FS arising under federal law, all pursuant to the judicial review provisions of the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706. GCT represents that only two of its claims are before us on appeal. GCT's first claim seeks relief under APA § 706(2) and alleges the FS —knowing full well UDWR's mountain goat plan would result in goats migrating into the Manti-La Sal National Forest and the Mt. Peale RNA—acted arbitrarily, capriciously, and unlawfully by denying GCT's three demands for relief. Meanwhile, GCT's second claim seeks relief under APA § 706(1) and alleges the FS unlawfully failed to act by refusing to comply with the FS regulation mandating RNA's "will be retained in a virgin or unmodified condition." 36 C.F.R. § 251.23.

The FS moved to dismiss GCT's complaint in its entirety under Fed. R. Civ. P. 12(b)(1) for failure to allege final agency action as required by APA § 704, and thus subject matter jurisdiction over the Government, which enjoys sovereign immunity absent congressional waiver. The district court granted the motion:

6

Plaintiffs have cleverly amalgamated federal law in an attempt to find some pathway to judicial review. Pulling apart Plaintiffs' contortions, the court [concludes] that it has no jurisdiction to review the Forest Service's action or inaction with respect to the mountain goats' occupation of the Manti-La Sal National Forest. . . . The Forest Service has not determined whether the goats' presence in the Manti-La Sal National Forest violates federal law or the existing Forest Plan. Nor has the Forest Service decided that it will never act on Plaintiffs' requests. The State acted and now the Forest Service is in the reactionary position attempting to determine what agency action, if any, is warranted. Accepting Plaintiffs' allegations as true, the court [holds] that Plaintiffs have failed to provide the court any action or inaction on behalf of the Forest Service that is reviewable under the APA.

*Utah Native Plant Soc'y v. United States Forest Serv.*, 2017 WL 822098, at *5 (D. Utah 2017) (unpublished). GCT appeals. Our jurisdiction arises under 28 U.S.C. § 1291. Our review of the complaint's sufficiency is de novo. *See Jones v. Needham*, 856 F.3d 1284, 1289 (10th Cir. 2017).

Because we consider the FS to make a facial attack on GCT's complaint, we "apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged." *Garling v. Envtl. Prot. Agency*, 849 F.3d 1289, 1293 n. 3 (10th Cir. 2017). We may supplement the complaint's well-pleaded facts, however, with the contents of documents referred to therein "if the documents are central to [GTC's] claim[s] and the parties do not dispute the documents' authenticity." *Hampton v. Root9B Tech.*, 897 F.3d 1291, 1297 (10th Cir. 2018). While we uphold dismissal of GCT's complaint under the foregoing standards, we believe the district court missed the mark when it concluded that because the FS is currently in the process of deciding

7

what to do, if anything, about the goats' presence in the national forest and RNA, it lacked jurisdiction to review the FS's "action or inaction" in its entirety.

## II.

We begin by analyzing GCT's first claim which, as we have described, alleges three instances of unlawful agency action. APA § 702 generally authorizes suit by "[a] person suffering legal wrong because of agency action." "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, *relief, or the equivalent or denial thereof*, or failure to act[.]" APA §551(13) (emphasis added). APA § 704 requires the challenged "action"—or, more accurately in this case, the FS's respective denials of GCT's three demands—constitute "final agency action." In *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), the Supreme Court decided that before agency action becomes final, such action must meet two conditions: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" (citations omitted). APA § 704's requirement of final agency action readily applies to GCT's first claim for relief under APA § 706(2) because subsection (2) directs a reviewing court to "hold unlawful and set aside *agency action* . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" (emphasis added).

8

A.

The first instance of FS action about which GCT complains is the former's denial of any authority to prohibit UDWR from releasing mountain goats *on Utah State lands* adjacent to the Manti-La Sal National Forest. Such denial surely constitutes final agency action. The FS explained that because it "does not regulate or control UDWR's activities that do not occur on NFS land," it cannot "prevent UDWR from transplanting goats anywhere in the La Sal Mountains." GCT's first demand, in other words, was "beyond the control of the Forest Service." This determination was not "merely tentative or interlocutory in nature"; it was conclusive. *Bennett*, 520 U.S. at 178. The FS told GCT that it did not have the legal authority to prevent the State of Utah from releasing mountain goats on State lands—first demand denied; end of discussion. The FS's denial of GCT first demand was based on a "final and binding" decision that "mark[ed] the 'consummation' of the agency's decisionmaking process" and from which "'rights and obligations have been determined.'" *Id.*

Yet while the FS's denial of GCT's first demand constitutes final agency action, this demand still plainly fails as a matter of law. *See Aguilera v. Kirkpatrick*, 241 F.3d 1286, 1290 (10th Cir. 2001) (recognizing that where a district court dismisses a complaint for lack of subject matter jurisdiction, we may affirm dismissal of the complaint for failure to state a claim under the same standards). GCT

9

acknowledges, as it must, that Utah has broad trustee and police powers over wildlife within its borders. *See Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976). But these powers, GCT tells us, are constrained by federal preemption principles derived from the Constitution's Supremacy Clause. *See* U.S. Const. art. VI, cl. 2. With this much we agree. GCT next turns to the Constitution's Property Clause, which provides: "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." *Id.* art. IV, § 3, cl. 2. GCT tells us the Property Clause extends to activities that endanger federal lands but are initiated on non-federal lands.[3] But as a mere grant of power "to make all needful Rules and Regulations," the Property Clause's plain language is not self-executing and does not itself grant the FS authority over Utah State lands adjacent to the Manti-La Sal National Forest.

Assuming the Property Clause reaches thus far, Congress, with the aim of preserving federal lands, might rely on it to enact legislation altering the State of Utah's authority to manage wildlife on its own lands. Federal legislation, however, does not supercede the historic police powers of the States "unless that was the clear

---

[3] Congress unquestionably has the authority to regulate conduct on *private* lands that is injurious to the public domain. *See United States v. Alford*, 274 U.S. 264, 267 (1927) ("Congress may prohibit the doing of acts upon privately owned lands that imperil the publicly owned forests."); *Camfield v. United States*, 167 U.S. 518, 528 (1897) (Congress has the "constitutional right of protecting the public lands from nuisances erected upon adjoining [private] property.").

and manifest purpose of Congress" in enacting such legislation. *Puerto Rico Dept. of Consumer Affairs v. Isla Petrol. Corp.*, 485 U.S. 495, 500 (1988). While Congress might enact legislation respecting national forests, the "clear and manifest purpose" of which is to preempt Utah's traditional trustee and police powers as a sovereign to manage wildlife within its borders, it has not done so. GCT points us to the Organic Administration Act of 1897 (Organic Act), which provides: "The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the . . . national forests . . . and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551. But the Organic Act's broad directive that the Secretary "make provisions for the protection against destruction by . . . depredations upon the . . . national forests," hardly evidences a "clear and manifest" purpose to encroach upon State sovereignty and override Utah's traditional management of wildlife within its borders *outside* the Manti-La Sal National Forest.

Nor can we say Utah's placement of mountain goats on State lands "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress" in the management of the national forest. *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987) (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)). Legislation supplemental to the Organic Act calling for

11

"cooperative federalism" between federal and state authorities in the area of wildlife management illustrates the point.[4] The Multiple-Use Sustained-Yield Act of 1960 (MUSYA), identifies a range of purposes national forests should serve. But the MUSYA also provides "[n]othing herein shall be construed as affecting the jurisdiction and responsibilities of the several States with respect to wildlife and fish on the national forests." 16 U.S.C. § 528. If "nothing" in the MUSYA affects the jurisdiction of the States with respect to wildlife on the national forests, surely "nothing" therein affects the jurisdiction of the States with respect to wildlife *off* the national forests. The Federal Land Policy and Management Act of 1976 (FLPMA), directs "the public lands be managed in a manner . . . that, where appropriate, will preserve and protect certain lands in their natural condition[.]" The FLPMA further

---

[4] Because most federal public land legislation calls for "cooperative federalism," express preemption of state laws and regulations is rare in public land law. *But see, e.g.*, 16 U.S.C. § 1535(f) (stating state endangered species laws and regulations cannot be less restrictive than federal laws and regulations). Absent express preemption, state laws and regulations still may be preempted in either of two ways:

> If Congress evidences an intent to occupy a given field [*i.e.*, field preemption], any state law falling within that field is pre-empted. If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law [*i.e.*, conflict preemption], that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objective of Congress.

*Granite Rock Co.*, 480 U.S. at 581 (citations omitted).

12

provides, however, that "nothing" in the FLPMA "shall be construed as . . . enlarging or diminishing the responsibility and authority of the States for management of fish and resident wildlife." 43 U.S.C. §§ 1701(a)(8), 1732(b). And the National Forest Management Act of 1976 directs the Secretary of Agriculture to develop, maintain, and revise land and resource management plans for the national forests "coordinated with the land and resource management planning processes of State and local governments[.]" 16 U.S.C. § 1604(a). In short, the clarity and manifestness of purpose necessary in the federal statutory scheme GCT relies on to demand the FS prohibit the State of Utah from releasing mountain goats on State lands adjacent to the Manti-La Sal National Forest is wholly lacking.

Like Congress, a federal agency by way of congressional delegation of authority also may preempt state laws and regulations. *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153–54 (1982). For example, after providing notice and opportunity for comment, the FS might issue preemptive regulations implementing the Organic Act's directive that the Secretary of Agriculture make provisions to protect the national forests from depredations. 16 U.S.C. § 551. Such federal regulations preempt state law to the extent compliance with both is impossible, or "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough Cty. v. Automated Med. Laboratories, Inc.*, 471 U.S.

13

707, 713 (1985); *see supra n*.4. This assumes, of course, such regulations are consistent with a reasonable interpretation of the Organic Act and the Secretary reasonably exercised Congress's delegation of authority. *See State of Kansas ex rel. Todd v. United States*, 995 F.2d 1505, 1509 (10th Cir. 1993) (citing *De La Cuesta*, 458 U.S. at 153–54 and *Chevron, Inc. v. Nat. Res. Def. Counsel*, 467 U.S. 837, 844 (1984)). But to say the FS may issue preemptive regulations is not to say it may do so subtly.[5] *See Isla Petrol. Corp.*, 485 U.S. at 500. Like our review of the Organic Act and related legislation, where the States have traditionally exercised trustee and police powers over a field, we assume federal regulations do not preempt the States' exercise of these historic powers unless their intent to do so is "clear and manifest." *Hillsborough Cty.*, 471 U.S. at 715–16.

Notably, nothing in 36 C.F.R. § 251.23, the sole FS regulation on which all of GCT's demands rest, expresses an intent to preempt the State of Utah's management of wildlife on State lands. Recall § 251.23 is the FS regulation which provides that an RNA within a national forest "will be retained in a virgin or unmodified

---

[5] To the degree GCT relies on the Forest Service Manual, the Manti-La-Sal National Forest Plan, and the Mt. Peale RNA Establishment Record to support its various demands—and it does so extensively throughout its complaint—we note such documents do not carry the force of law. *See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (distinguishing agency adjudications and notice-and-comment rulemaking, both of which have the force of law, from opinion letters, policy statements, agency manuals, enforcement guidelines, and the like, all of which lack the force of law).

14

condition." But the FS has never proposed the sweeping interpretation of § 251.23 that GCT now endorses, perhaps because in most instances means exist to prevent depredations of the national forests and RNAs short of wholly disrespecting State sovereignty over State lands, *e.g.*, removing destructive wildlife from the forest. Because a federal agency may address problems in detail and speak through a number of means, we expect an agency will clearly tell us if it intends for its regulations to preempt the historic police powers of the States. *Hillsborough Cty.*, 471 U.S. at 718; *see also Granite Rock Co.*, 480 U.S. at 583 ("[I]t is appropriate to expect an administrative regulation to declare any intention to pre-empt state law with some specificity."); *Integrity Mgmt. Int'l, Inc. v. Tombs & Sons, Inc.*, 836 F.2d 485, 492–93 (10th Cir. 1987) ("[U]nless an agency has explicitly stated an intent to preempt state law, there is a presumption that no such intent exists.").

Here, the FS has never expressed an intent—let alone a clear and manifest one—to preempt the power of the State of Utah in its sovereign capacity to manage wildlife *on its own public lands,* regardless of where such wildlife wanders off. Whether the FS has the authority to do so by way of congressional delegation pursuant to the Organic Act is beside the point. We need do no more than apply the applicable law to the well-pleaded factual allegations of GCT's complaint (sans the myriad of legal arguments and conclusions contained therein) to sustain the FS's determination that it lacked the legal authority to prohibit the State of Utah, or more

15

particularly UDWR, from releasing mountain goats on State lands adjacent to the Manti-La Sal National Forest. The FS's legal conclusion that under federal law it could not prohibit the State of Utah from releasing mountain goats on State lands was neither "arbitrary, capricious, an abuse of discretion, [n]or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

B.

The second agency action about which GCT complains is the FS's denial of the authority to regulate the State of Utah's "occupancy" and "use" of the Manti-La Sal National Forest by requiring UDWR to obtain a special use permit before releasing mountain goats on State lands. Like the FS's denial of GCT's first demand, its denial of GCT's second demand also constitutes final agency action under the APA. The FS informed GCT that because UDWR released the mountain goats on State lands, UDWR "was not using or occupying NFS land at the time of [their] release," and therefore special use authorization from the FS was not required under FS regulations—second demand denied; end of discussion. This second denial of relief, like the first, was not "tentative or interlocutory," but was "final and binding." *Bennett*, 520 U.S. at 178. Once the FS decided UDWR was not required to obtain a special use permit before releasing the mountain goats on State lands nothing else was left to decide and legal rights had been determined.

16

Still, GCT's second demand—as novel and far-reaching as its first—also plainly fails as a matter of law. Absent "special use authorization," Forest Service regulations generally prohibit "uses [except those otherwise enumerated] of National Forest System lands . . . and resources." 36 C.F.R. §251.50. In particular, § 251.23 prohibits "occupancy [of an RNA] under a special use permit . . . unless authorized by the Chief of the FS." GCT says the mountain goats' release point on State lands is irrelevant to its argument regarding UDWS's occupancy and use of the national forest. According to GCT, the FS is authorized "to regulate and prohibit the goat introductions because the State airlifted them to the La Sal Mountains knowing the goats would use and harm the Manti-La Sal National Forest and Mt. Peale RNA." Two pertinent points demonstrate the fallacy of GCT's argument —based entirely on UDWR's scienter—that the mountain goats are, in effect, instrumentalities of the State whose presence in the national forest and RNA constitute the State's occupancy and use of the forest.

Federal ownership of lands within a State does not in itself withdraw those lands from the jurisdiction of the State. *Kleppe*, 426 U.S. 544. "Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory," subject to Congress's "power to enact legislation respecting those lands pursuant to the Property Clause." *Id.* at 543–44. We have already observed that Utah, not as a private property owner but in its sovereign capacity, has historically

17

possessed broad trustee and police powers over wildlife within its borders. *See id.* at 545. Just as we did in our preceding analysis regarding the State's authority to release wildlife on its own lands, we assume neither Congress nor the FS intended its enactments to alter the State of Utah's "historic police powers to manage wildlife *on federal lands within its borders*" unless such intent is "clear and manifest." *Wyoming v. United States*, 279 F.3d 1214, 1231 (10th Cir. 2002) (emphasis added). And again, at the same time, we remain mindful that we "must give full effect to evidence that Congress considered, and sought to preserve, [Utah's] *coordinate* regulatory role in our federal scheme." *Id.* (emphasis added) (quoting *California v. FERC*, 495 U.S. 490, 497 (1990)); *see supra* at 11–13.

Where the FS has never asserted exclusive jurisdiction over the management of wildlife in the Manti-La Sal National Forest, GCT's argument that the State of Utah needs a special use permit before releasing wildlife on State lands—regardless of whether everyone knew such wildlife would end up in the national forest and RNA—runs counter to Congress's determination, and the FS's obvious recognition in this case, that the State retains a measure of sovereignty over wildlife management within the national forest. *See Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1248 (D.C. Cir. 1980) ("Despite its ability to take control into its own hands, Congress has traditionally allotted the authority to manage wildlife to the States."); 36 C.F.R. § 241.2 (FS regulation calling for cooperation with state officials in the

18

management of wildlife within the national forests). That the State's wildlife management responsibilities within the national forest are not exclusive and may be overridden under appropriate circumstances does not mean those management responsibilities are meaningless absent federal law to the contrary. *See Baldwin v. Fish and Game Comm'n*, 436 U.S. 371, 386 (1978).

The next and perhaps more salient point concerning GCT's second demand is the mountain goats are *ferae naturae* or wild animals. *See generally Pierson v. Post*, 3 Cai. 175 (N.Y. Sup. Ct. 1805). As a means of reducing goat populations in other mountainous areas of the State, UDWR captured the goats and then released them onto State lands adjacent to the Manti-La Sal National Forest. Because wild animals are not the private property of those whose lands they occupy, the State of Utah, at least once it released the goats back into the wild, did not own the goats in the sense that UDWS's failure to control their expected movement constituted a sort of trespass onto national forest lands requiring special use authorization from the FS. Our en banc decision in *Mountain States Legal Found. v. Hodel*, 799 F.2d 1423 (10th Cir. 1986) (en banc) settles the score. In that case, we rejected a private association's argument under the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331–37, that "wild horses are . . . instrumentalities of the federal government whose presence on the association's property constitutes a permanent governmental occupation." *Id.* at 1428. We explained:

19

Neither state nor federal authority over wildlife is premised on any technical "ownership" of wildlife by the government. Although older decisions sometimes referred to government "ownership" of wildlife, that language has been deemed "a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource." *Toomer v. Witsell*, 334 U.S. 385, 402 (1948). As the Supreme Court declared, "[I]t is pure fantasy to talk of 'owning' wild fish, birds, or animals. Neither the States nor the Federal Government . . . has title to these creatures until they are reduced to possession by skillful capture. *Douglas v. Seacoast Prod., Inc.*, 431 U.S. 265, 284 (1977) . . . .

*Mountain States Legal Found.*, 799 F.2d at 1426.[6]

The FS's conclusion regarding GCT's second demand, namely that it could not require the State of Utah to seek special use authorization to occupy and use the Manti-La Sal National Forest and Mt. Peale RNA before releasing mountain goats on State lands adjacent to the forest, was neither arbitrary, capricious, nor an abuse of discretion, but was entirely consistent with applicable law. Under a proper assessment of this case, GCT's second demand simply proves too much. The answer

---

[6] GCT's reliance on *Light v. United States*, 220 U.S. 523 (1911) to support its second demand is misplaced. In *Light*, a private property owner permitted his domestic cattle, a herd in the range of 500, to move from his property to a Forest Reserve and graze thereon in violation of federal regulations establishing grazing districts on which only a limited number of cattle were allowed. The Supreme Court upheld an injunction prohibiting the landowner "from pasturing his cattle on the . . . Forest Reserve, because he had refused to comply with the regulations adopted by the Secretary of Agriculture, under the authority conferred by [the Organic Act], to make rules and regulations as to the use, occupancy, and preservation of forests." *Id.* at 534. One of among other reasons this case is unlike *Light* is because once the State released the mountain goats onto State lands and into the wild, any arguable ownership interest the State temporarily had in the goats upon their capture comparable to that of a chattel owner was no more.

20

to the legal question of whether federal law required the State of Utah as sovereign to obtain special use authorization to occupy and use the national forest before releasing mountain goats on State lands is a resounding no.

C.

Our conclusions thus far—that the State of Utah presently has the authority to release mountain goats on State lands adjacent to the Manti-La Sal National Forest and may do so absent special use authorization from the FS—say nothing about the FS's ability to manage the mountain goats consistent with federal policies and objectives once the goats enter the national forest and more specifically the Mt. Peale RNA. "The governmental trust responsibility for wildlife is lodged initially in the States, but only in so far as its exercise may not be incompatible with, or restrained by [federal law]." *Mountain States Legal Found.*, 799 F.2d at 1426 (quotations omitted). And this brings us to the third demand of GTC's first claim which posits the FS remove the goats from the national forest and RNA instanter.

Lest it become too comfortable with our analysis thus far, we remind the State of Utah, who appears herein as amicus together with seven other States in support of the FS, that the Supreme Court has "repeatedly observed that the power over the public lands . . . entrusted to Congress is without limitations." *Granite Rock Co.*, 480 U.S. at 580 (quotations omitted). And the power of the FS under the Organic Act to protect the habitat of national forests "does not admit of doubt." *Hunt v.*

21

*United States*, 278 U.S. 96, 100 (1928).  In *Hunt*, deer had "greatly injured" the lands of a national game preserve inside a national forest "by overbrowsing upon and killing valuable young trees, shrubs, bushes, and forage plants."  *Id.* at 99.  The Supreme Court upheld the power of the Secretary of Agriculture under the Organic Act to order the destruction of the deer where necessary to protect the game preserve and national forest.  Several years later, in *New Mexico State Game Comm'n v. Udall*, 410 F.2d 1197 (1969), we held the supervisory powers granted the Secretary of Interior over the management of national parks authorized the Secretary, without the State's approval, to direct the killing of a number of deer within a national park for an ecological study *prior to* any serious deterioration of habitat.  Opining that "[i]n protecting the park property it is immaterial that the United States does not have exclusive jurisdiction over the land within [the park]," we rejected the State's argument that "the deer-killing program could be undertaken only after a showing or a finding that there was existing depredation caused by the deer."  *Id.* at 1199, 1201.  Given these controlling precedents, we do not question the authority of the FS under the Organic Act and related legislation—if exercised as a valid preventative or restorative measure—to remove the mountain goats from, or reduce the size of the herd now residing in, the Manti-La Sal National Forest and Mt. Peale RNA.

As the reader understands by now, however, the preliminary inquiry is whether GCT's first claim alleges "final agency action" by asserting the FS did not meet its

22

demand to remove the goats from the national forest and RNA. GCT's complaint

states that in May 2015, the Regional Forester responded to GCT's demand to

remove the goats: "The Forest Service reiterated that it was developing, with the

State's assistance, a five-year monitoring plan for four rare alpine plants where

monitoring results would be evaluated annually." The Forester's letter explained:

> The Forest Service received your Survey Report on the impacts of mountain goats on plants with special status in November of 2014. While the report suggests negative impacts to plants from mountain goat foraging, it also indicates a need for more refined data collection. In regard to your monitoring documenting trampling evidence within the Mount Peale RNA, evidence similar to that observed by GCT was documented in the area prior to goat introductions, and your trampling evidence was not clearly demonstrated to be the result of mountain goat use. In addition, your observations were not within a fixed area plot, so the density of trampling occurrences cannot be calculated, or compared to future data to establish a trend.

After the Regional Forester rejected GCT's demand to remove the goats from the

national forest immediately, GCT unsuccessfully petitioned the Chief of the FS to

order the goats removed. GCT's complaint represents the Chief denied its third

demand and informed GCT the FS "would gather and evaluate the goats' impact and

work with the State to determine whether additional actions were warranted."

Referring to the Regional Forester's prior letter to GCT, the Chief reiterated, "there

is no compelling evidence to show that the mountain goats introduced by UDWR are

causing immediate damage to NFS land or resources."

23

We do not deny that reasonable minds presently may differ about the impact the mountain goats are having on the Mt. Peale RNA. In fact, some disagreement appears within the FS itself. As we have observed on multiple occasions, "habitat management is a delicate venture." *Wyoming*, 279 F.3d at 1239 (brackets omitted) (quoting *Sierra Club-Black Hills Grp. v. United States Forest Serv.*, 259 F.3d 1281, 1286 (10th Cir. 2001)). But the present disagreement over whether the FS must send the goats packing far away from the Manti-La Sal National Forest, no matter how pressing GCT believes the situation to be, does not alone imbue with finality the FS's decision to study the matter further, such that relief upon proper proof is *currently* available to GCT under APA § 706(2). The FS has acknowledged the situation and informed GCT that it needs a reasonable period of time to decide how to proceed.[7] *See Oil, Chemical and Atomic Workers Int'l Union v. Zegeer*, 768

---

[7] The Regional Forester outlined the FS's intentions in her May 2015 letter:

The [FS] is continuing to work with UDWR to evaluate [habitat] impacts. We have developed a rigorous five year monitoring plan to evaluate population trends of four rare alpine plant species and track shifts in species composition and ground cover in the alpine zone, including the Mount Peale [RNA]. The monitoring protocol includes recording direct impacts by grazing animals and uses motion sensing camera[s] to determine the animal species involved. Monitoring data will be analyzed and evaluated annually relative to Forest Plan direction for rare plant species and Federal standards for protection of [RNAs]. Based on the results of each annual evaluation, the [FS] will work cooperatively with UDWR to determine an appropriate course of action concerning management of the mountain goats, including whether or not removal or reduction in population objectives is warranted.

24

F.2d 1480, 1485 (D.C. Cir. 1985) (concluding the APA indicates a congressional view that federal agencies should act within reasonable time frames). This is the bureaucratic process—like it or not. To suggest the refusal of the FS to remove the goats from the national forest and RNA this very moment is a sort of agency action "mark[ing] the 'consummation' of the agency's decisionmaking process," rather than a "tentative or interlocutory" action, is simply inconsistent with the complaint's factual allegations and the underlying documents on which those allegations rely. *Bennett*, 520 U.S. at 178. The district court was correct in holding it lacked subject matter jurisdiction to review the FS's denial of GCT's third demand for want of final agency action.

III.

While the FS's "wait and see" response to GCT's demand that it remove the mountain goats from the Manti-La Sal National Forests does not constitute "final agency action" under the APA, GCT's second claim is that such response does constitute a "failure to act", redresssable under APA § 706(1) as agency action "unlawfully withheld." According to GCT, 36 C.F.R. § 251.23 contains a categorical imperative the FS refuses to heed: "Research Natural Areas will be retained in a virgin or unmodified condition except where measures are required to maintain a plant community which the area is intended to represent."

25

APA § 704's requirement of final agency action does not square well with a definition of "agency action" that includes a "failure to act." 5 U.S.C. § 551(13). And obviously, the test the Supreme Court has set forth to determine whether agency action is final does not readily accommodate an agency's failure to act. *Bennett*, 520 U.S. at 177–78. "If an agency has failed to act with respect to a matter that a complaining party seeks to compel under § 706(1), it is hard to comprehend the contested inaction as 'final action' as that term is defined in *Bennett v. Spear*." *Western Org. of Resource Councils v. Zinke*, 892 F.3d 1234, 1247 (D.C. Cir. 2018) (Edwards, J., concurring). Indeed, we have noted the problem and observed that some courts have "implicitly recognized that unlawfully withheld actions are considered final under § 704." *Southern Utah Wilderness Alliance v. Norton*, 301 F.3d 1217, 1229 n.9 (10th Cir. 2002), *rev'd* 542 U.S. 55 (2004) (hereinafter *SUWA*).

Fortunately, in *SUWA* the Supreme Court considered "what limits the APA places upon judicial review of agency inaction." *SUWA*, 542 U.S. at 61. To "protect agencies from undue judicial interference with their lawful discretion," among other reasons, the Court held "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id*. at 64, 66; *see Wyoming v. United States Dept. of Interior*, 839 F.3d 938, 942 (10th Cir. 2016). The Supreme Court explained APA § 706(1) carries forward courts' traditional practice of reviewing a governmental entity's failure to act by way

26

of writ of mandamus. "The mandamus remedy was normally limited to enforcement of 'a specific, unequivocal command,' the ordering of a 'precise act about which an official had no discretion whatever.'" *SUWA*, 542 U.S. at 63 (brackets, citations and ellipses omitted). Consistent with such practice, the Court reasoned "§706(1) empowers a court only to compel an agency to perform a ministerial or non-discretionary act or to take action upon a matter, without directing *how* it shall act." *Id.* at 64 (quotations omitted).

The language of the FS regulation at issue in this case, § 251.23, certainly is mandatory as to the ultimate objective. The regulation plainly states RNA's "will be retained in a virgin or unmodified condition[.]" The regulation, however, leaves entirely to the FS the decision of how best to achieve this objective. Indeed, GCT's complaint recites provisions of the Forest Service Manual (FSM) which suggest as much. The complaint states FSM 4063.30(4) advises the FS to "'[r]emove exotic plants or animals [from an RNA] *to the extent practicable*.'" (emphasis added). Meanwhile, FSM 4063.32 advises: "If exotic plants or animals have been introduced into an established [RNA], the Station Director and the Regional Forester *exercise control measures* that are in keeping with established management principles and standards *to eradicate them, when practical*." (emphasis added).

So assuming the mountain goats presence within the Manti-La Sal National Forest and Mt. Peale RNA is inconsistent with § 251.23's objective, how shall the

27

FS proceed? FSM 4062.30(4) tells us removing the mountain goats from the national forest and RNA is one option. FSM 4063.32 tells us eradicating or destroying the goats is another option. Or perhaps a reduction in the size of the herd would suffice. Maybe a fence or other barrier to surround the goats, the habitat, or both would be feasible. Maybe a spray or other similar mean exists that would not harm the foliage within the RNA but make it less desirable to a mountain goat's palate. Section 251.23 does not foreclose any of these options. In other words, the FS regulation provides us with no discernible rules under which we may direct the FS to act in exercising its enforcement powers. Section 251.23 simply does not call for a discrete action that will assure us the RNA "will be retained in a virgin or unmodified condition[.]" *See Black's Law Dictionary* 565 (10th ed. 2014) (defining "discrete" as "[i]ndividual; separate; distinct"). We are not experts in the field of habitat management and preservation and surely have no business attempting to instruct the FS how best to achieve § 251.23's objective. See *SUWA*, 542 U.S. at 66–67. The crux of the matter is GTC's complaint does not allege the FS has failed to take a *discrete* agency action that FS regulations *require* it take. *See SUWA*, 542 U.S. at 66. Therefore GCT's second claim based on the FS's failure to act is not cognizable.

\* \* \*

As modified, the judgment of the district court dismissing GCT's complaint is AFFIRMED.

28

No. 17-4074, *tah Native Plant Society, et al. v. United States Forest Service, et al.*

**EID**, J., concurring in part and concurring in the judgment in part.

I agree with the majority that the U.S. Forest Service's (USFS) refusal to remove the mountain goats does not constitute final agency action because the USFS's letter deferred agency action pending future research and data collection regarding the goats' impact. Maj. Op. at 21-25. I would conclude, however, that the USFS's "wait and see" approach also applies to the request to subject the goats to the special use permit process and to prevent future releases by the state. *Contra id.* at 9-21. Accordingly, I would affirm the district court's decision that final agency action is lacking in its entirety in this case, and thus would not reach the merits.

Assessing whether there is final agency action in this case rests upon how we interpret the August 7, 2015 letter sent by the Chief of the USFS, Thomas L. Tidwell, to the plaintiffs. In the letter, Tidwell states that "the Forest Service is working cooperatively with [the state] to evaluate any resource impacts and to determine <u>an appropriate action</u>, including consideration of removal of the mountain goats from the RNA[1] or reduction in herd numbers." App 78 (emphasis added). In other words, the USFS is performing further evaluation of goat impact before it takes "an appropriate action." I read "appropriate action" to leave all three possible actions—removal,

---

[1] "RNA" refers to the Mount Peale Research Natural Area. Forest Service regulations provide that an RNA "will be retained in a virgin or unmodified condition except where measures are required to maintain a plant community which the area is intended to represent." 36 C.F.R. § 251.23

regulation, and prevention—on the table. In my view, simply because the sentence specifically states that an "appropriate action" might include the possibility of removal does not exclude regulation and prevention as "appropriate action[s]."

This interpretation is reinforced by the May 12, 2015 letter from Nora B. Rasure, Regional Forester, to the plaintiffs, from which they appealed to Tidwell. In that letter, Rasure expressly lays out the plaintiffs' three requests—namely, "your letter asserts that the [USFS] has authority [1] to remove the mountain goats that have been transplanted, [2] prevent transplant of more mountain goats, and [3] require [the state] to obtain 'special use authorizations' in order to transplant any more mountain goats, or maintain existing goats, that may be located on [Forest Service land]." App 75. Rasure ends the letter, in a statement echoed by Tidwell, with the following: "Based on the results [of the further research and data collection], the Forest Service will work cooperatively with [the state] <u>to determine an appropriate course of action concerning management of the mountain goats</u>, including whether or not removal or reduction in population objectives is warranted." App 76 (emphasis added). Again, based on the language that defers a decision on an appropriate action, the USFS is adopting a "wait and see" approach as to all options—including removal, regulation, and prevention—regarding the mountain goats.

The district court[2] concluded that the Tidwell letter indicated "that before the agency could initiate any action," the USFS had to gather additional data "sufficient to

---

[2] The parties consented to having a magistrate judge adjudicate this case pursuant to 28 U.S.C. § 636(c).

2

demonstrate agency action was warranted." Dist. Ct. Op. at 6. I agree, and would find

that there is no final agency action for us to review in this case. *See McKeen v. United*

*States Forest Service*, 615 F.3d 1244, 1253 (10th Cir. 2010) ("Pursuant to the APA, we

have jurisdiction to review only 'final agency actions'").

In concluding that there is final action regarding permitting, the majority focuses

on the second paragraph of the Tidwell letter, which states that:

> In our response dated May 12, 2015, [Rasure] stated the Forest Service did not
> allow or in any way sanction the introduction of mountain goats by the [state]. In
> fact, the [state] did not release the mountain goats on [USFS] land, and therefore
> was not using or occupying [USFS] land at the time for the mountain goat release.
> The mountain goats have strayed onto adjacent [Forest Service] land . . . after they
> were released on non-Federal land by [the state].

App 77. The majority takes from this that the plaintiffs' "demand [to use the permitting

process was] denied; end of discussion." Maj. Op. at 16. But I would not take this as a

rejection of using the permitting process, as the majority does. The above-quoted

statement follows Tidwell's description of the plaintiffs' concerns, namely, that "the

[USFS] is violating Federal law by '<u>allowing goats in the National Forest</u> and Mount

Peale RNA.'" App 77 (emphasis added). Tidwell's response was to deny that the USFS

was "allowing goats" on Forest Service land. Granted, Tidwell did point out that goats

were not released onto Forest Service land, but instead "strayed" there after their release.

But again, this statement is in direct response to the plaintiffs' allegation that the USFS

"allowed" goats on Forest Service land. Indeed, the next paragraph of the letter goes on

3

at length to detail the various efforts the USFS made to object to the introduction of

mountain goats by the state. *Id*.[3]

More importantly, nowhere does the Tidwell letter refer to the permitting process.[4]

This silence is perhaps explained by the fact that the plaintiffs' June 13, 2015 letter to

Tidwell <u>does not ask for action on permitting</u>. Instead, it requests that the USFS "(1)

---

[3] The paragraph states:

As explained in [Rasure's] letter, before the release of the mountain goats, the Forest Service coordinated with [the state], and objected to the transplant. In July 2013, the Forest Supervisor Expressed concerns about the proposed transplant. In a letter dated August 21, 2013, the Forest Service urged the [state] Wildlife Division Board to delay its decision on the mountain goat transplant to provide additional time to coordinate on the potential impacts the mountain goats may have on the RNA, and indicated that the Forest Service did not support the transplant at that time because of the uncertainty about the potential impacts to the RNA and sensitive alpine plant species. When the Wildlife Division Board decided to move forward with the transplant, the Forest Service contacted the [state] with a letter dated August 27, 2013, to request a delay in the transplant to allow data gathering to assess the impacts of any transplant. [The state's] August 30, 2013 response stated that it intended to move forward with the transplant of a small number of mountain goats, but would work cooperatively with the Forest Service to assess impacts, and develop a strategy to prevent overutilization of the habitat.

App 77.

[4] The Rasure letter does refer to permitting process, as well as to the fact that the mountain goats were released on state land, but it does so "[a]s noted in your letter," meaning Rasure is repeating what the plaintiffs stated in their December 24, 2014 letter to her regarding the location of the goats at the time of release. Rasure concludes the paragraph by stating that "We do acknowledge that is was reasonably foreseeable that the goats might wander onto [USFS] land from where they were released." App 75. Again, however, this a description of the challenges of releasing goats near Forest Service land, not a denial of a particular remedy to address that challenge.

4

immediately remove . . . all mountain goats from the La Sal Mountains; and (2) prohibit the [state] from introducing additional goats to the La Sal Mountains." App 325. It then requests a "formal written response . . . indicating that the requested actions will occur" or be denied. *Id*. Before this court, the USFS does not argue that the permitting claim is unexhausted or waived, but instead suggests it is subsumed in the request for removal—a request on which there is no final action. *See* USFS Brief at 19 (arguing that the USFS has "deferred ruling on whether the remove or destroy mountain goats or how to regulate them"). To me, this reading best comports with the Tidwell letter. I therefore would hold that the USFS has adopted a "wait and see" approach as to the goats currently on Forest Service land, studying options for action that might include removal or regulation. Permitting is simply one regulatory alternative. *See* Maj. Op. at 27-28 (listing others).

Whether final agency action exists regarding future releases is a closer call, but I would find it is similarly lacking. The majority finds final agency action in the last paragraph of the Tidwell letter, which states that "your request that the Forest Service prevent [the state] from transplanting goats anywhere in the La Sal Mountains is beyond the control of the Forest Service." App 78. From this statement, the majority concludes that the plaintiffs' "demand [to prevent future releases was] denied; end of discussion." Maj. Op. at 9. But the majority does not consider the sentences that follow, which state that the USFS "has not authorized, and has no plans to authorize, the release of mountain goats on [Forest Service] land in the La Sal Mountains. The [state] has not informed the [USFS] of any additional planned releases." App 78. When read in context, the Tidwell letter suggests that while the USFS believes it has no authority to broadly forbid the state

5

from taking action "anywhere" in the La Sal Mountains, it is keeping its options open for the future. Contrary to the majority's interpretation, then, the letter does not suggest an end of discussion, but rather indicates that such action is not necessary at this time because USFS is not aware of any planned releases.

At the very least, the USFS's response—that the agency has no authority to prevent goat transplantation "anywhere" in the La Sal Mountains, but there is no immediate need for such prevention given that the state has not indicated it will be introducing goats in the near future—is unclear. The plaintiffs bear the burden of showing finality. *Col. Farm Bur. Fed'n v. U.S. Forest Service*, 220 F.3d 1171, 1173 (10th Cir. 2000) ("Plaintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of [the APA]."). Given the lack of clarity regarding the USFS's response, I would find that the plaintiffs have not met their burden to show final agency action regarding future releases.

In sum, the USFS informed the plaintiffs that it would have to further evaluate the impact that the goats were having before deciding to take "an appropriate action," whatever that may be. As the district court put it, the USFS "has [not] decided that it will never act on Plaintiffs' requests. The State acted and now the [USFS] is in the reactionary position attempting to determine what agency action, if any, is warranted." Dist. Ct. Op. at 10. Under the circumstances, the USFS's decision to further study the impact that the mountain goats are having on the RNA before taking any action is "tentative [and] interlocutory [in] nature," and therefore not a final agency decision. *U.S. Army Corps of Eng'rs v. Hawkes Co.,* 136 S. Ct. 1807, 1813 (2016). Accordingly, I

6

would affirm the dismissal of the case in its entirety, and not reach the merits of the

plaintiffs' claims.[5]

---

[5] I agree with the majority with regard to the second issue presented in this case, namely, that the "wait and see" approach does not constitute an actionable "failure to act." Maj. Op. at 25-28.

7